Gilbert **CHARLAND, in his capacity as a shareholder of Country View Golf Club, Inc.**

v.

**COUNTRY VIEW GOLF CLUB, INC., and Albert Favreau.**

No. 89–406 Appeal.

Supreme Court of Rhode Island.

March 28, 1991.

Edward F. St. Onge, Smithfield, for plaintiff.

William L. Bernstein, Greenville, for defendant.

Matthew Medeiros, Jeffrey Schreck, Robert Karmen, Flanders & Medeiros, Providence, for amicus curiae.

1. Albert Favreau is president of Country View Golf Club, Inc., and is also a named defendant in this controversy.

OPINION

KELLEHER, Justice.

The plaintiff in this litigation, Gilbert Charland, is a minority shareholder in a Rhode Island closely held corporation that owned and operated an eighteen-hole, 147–acre golf course located in the town of Burrillville. The defendant, Country View Golf Club, Inc., is the corporation.[1] Hereafter we shall refer to the plaintiff as Charland and to the defendant as Country View.

On September 4, 1984, Charland, a 15 percent shareholder of Country View's stock, that is, an owner of fifteen shares, filed a complaint in the Superior Court asking that Country View be dissolved. Charland relied on G.L.1956 (1985 Reenactment) § 7–1.1–90,[2] which provides:

"(a) The superior court shall have full power to liquidate the assets and business of a corporation:

(1) In an action by a shareholder when it is established that, whether or not the corporate business has been or could be operated at a profit, dissolution would be beneficial to the shareholders because

\*　　\*　　\*　　\*　　\*　　\*

(B) The acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent."

Specifically Charland alleged that one of the officers of the corporation was engaging in illegal activities.

After filing an answer, Country View, acting pursuant to § 7–1.1–90.1, elected to purchase Charland's fifteen shares. Section 7–1.1–90.1 provides, in part:

"Whenever a petition for dissolution of a corporation is filed by one or more shareholders (hereinafter in this section referred to as the 'petitioner') pursuant to \* \* \* § 7–1.1–90 \* \* \* the corporation or one or more of its other shareholders

2. At the time Charland filed the complaint, the 1969 Reenactment was in effect. The 1985 Reenactment, which is used throughout this opinion, made no substantive changes to the 1969 Reenactment.

may avoid such dissolution by filing with the court * * * an election to purchase the shares owed by the petitioner *at a price equal to their fair value.* * * * If the parties are unable to reach an agreement as to the fair value of such shares, the court shall * * * stay the proceeding and determine the value of such shares, in accordance with the procedure set forth in § 7–1.1–74, *as of the close of business on the day on which the petition for dissolution was filed.*" (Emphasis added.)

Thus § 7–1.1–90.1 contains three provisions. First, a corporation, rather than be forced to dissolve by a shareholder dissolution petition, can elect to buy out the shareholder's stock. Second, the corporation must pay fair value for such shares. Third, if the fair value cannot be agreed upon, the court shall determine the value of such shares as of the close of business on the day on which the petition for dissolution was filed.

Charland and Country View could not agree on the fair value of Charland's shares. Therefore the court, in accordance with § 7–1.1–74, appointed an appraiser. Section 7–1.1–74(e) provides that "The court may, if it so elects, appoint one or more persons as appraisers to receive evidence and recommend a decision on the question of fair value. The appraisers shall have such power and authority as shall be specified in the order of their appointment or an amendment thereof."

When this matter come before a Superior Court justice, the appraiser testified regarding the contents of his report. The trial justice then determined that the appraiser's testimony, instead of resolving the problem involving the value of Charland's stock, raised further questions. Consequently the trial justice designated a second accountant as the court's appraiser pursuant to an order dated March 4, 1988. The order directed the second appraiser, Joseph R. Smith (Smith), to determine the fair value of Charland's shares as of September 30, 1984.[3]

Smith's report to the trial justice noted the inherent difficulties in evaluating the value of a golf course in Burrillville. The appraiser then discussed the applicability of a minority discount in evaluating the shares. Smith concluded that a "minority discount" would be appropriate in determining the fair value of Charland's shares.[4]

Smith submitted two figures in his report. The first, or lower, valuation included a minority discount and was the one suggested by Smith. The trial justice, however, accepted the second, or higher, calculation.

The second figure of $9,273.05 per share, or $139,095.73, was arrived at in the following manner: first, Smith noted that the golf course was sold for $2 million in 1988; second, Smith used the present value procedure to discount the $2 million figure and arrive at the value of the entire golf course as of September 30, 1984; and finally, without applying an additional minority discount, Smith took 15 percent of the 1984 value in order to arrive at the value for Charland's 15 shares (out of 100) in the corporation. The trial justice ultimately awarded Charland the sum of $139,095.73.

Although Smith did not discount Charland's shares for their minority status, his explanation accompanying this evaluation is noteworthy. Smith stated:

3. There appears to be an error in the order of March 4, 1988, that appoints Smith as the appraiser. General Laws 1956 (1985 Reenactment) § 7–1.1–90.1, as noted earlier, requests the court to calculate the fair value of the shares "as of the close of business on the day on which the petition for dissolution was filed." Charland filed the petition for dissolution on September 4, 1984. The order, on the other hand, requests the appraiser to determine the fair value of the shares "as of the close of business on September 30, 1984." Smith complied with the order and made recommendations regarding

the value of Charland's shares as of the close of business on September 30, 1984.

4. In his report, Smith failed to distinguish between a minority discount and a lack of marketability discount. Smith combined elements of both discounts but ultimately labeled the discount a "minority discount." Because of the ambiguity created by Smith's report, we will address the applicability of both a minority discount and a lack of marketability discount to Charland's shares.

"[T]he 1988 selling price in the amount of $2,000,000.00 was discounted back to the year 1984. * * * Regrettably there are no inflationary statistics available for the like kind property in Burrillville, Rhode Island for the intervening years and reliance had to be placed on the statistics available for personal residences. It is self evident that the inflationary impact on personal homes vastly exceeded the norm for other parcels of property. In recognition of that fact, the valuation derived from this present value procedure in the amount of $927,305.00 was not again discounted for minority shareholders diminished capacity, *since in effect the impact of such a discount had already been realized.*" (Emphasis added.)

Although Charland raised a number of issues on appeal, he failed to furnish us with a complete transcript of the Superior Court proceeding. As a result, we shall consider the only issue that was before the trial justice. This issue is whether Charland received fair value for his shares pursuant to § 7–1.1–90.1.

Three separate issues must be resolved in determining fair value. The first issue is whether this court should apply a minority discount to Charland's shares. The second issue is whether this court should apply a discount for lack of marketability. The third issue is whether any discount was, in fact, applied to Charland's shares with the result that Charland received less than the fair value prescribed by § 7–1.1–90.1. We shall now consider each of these three issues.

A minority discount has been described as a second-stage adjustment for valuing minority shares. *See* Note, *Rejecting the Minority Discount*, 1989 Duke L.J. 258, 260. That is, after a minority shareholder's stock is initially discounted for the minority percentage owned, the pro rata

value is determined. Then an additional discount is applied to the pro rata value because the minority shareholder lacks corporate decisionmaking power. *Id.* This second calculation is called a minority discount.

The issue of whether to apply a minority discount in a situation in which a corporation elects to buy out a shareholder who has filed for dissolution has never been resolved by this court. In fact, few jurisdictions have decided this question.[5]

Most courts that have considered this question have agreed that no minority discount should be applied when a corporation elects to buy out the shareholder who petitions for dissolution of the corporation. *See, e.g., Brown v. Allied Corrugated Box Co.,* 91 Cal.App.3d 477, 485–87, 154 Cal. Rptr. 170, 173–76 (1979); *Blake v. Blake Agency, Inc.,* 107 A.D.2d 139, 486 N.Y.S.2d 341, *appeal denied,* 65 N.Y.2d 609, 484 N.E.2d 671, 494 N.Y.S.2d 1028 (1985). *But see McCauley v. Tom McCauley & Son, Inc.,* 104 N.M. 523, 535, 724 P.2d 232, 244 (1986) (trial justice has discretion in determining whether a minority discount is applicable).

*Brown v. Allied Corrugated Box Co.* is an often-cited case in this area of law. In *Brown* a minority shareholder in a closely held corporation initiated an action for involuntary dissolution. The majority shareholder asked to purchase the minority shareholder's stock. The two parties could not reach an agreement regarding the value of the minority shares. A commission comprising three appraisers valued the shares, and two of the three commissioners (majority commissioners) devalued the shares for their noncontrolling status.

On appeal the court reversed the judgment confirming the report of the majority commissioners. The court conceded that if the shares were placed on the open market, their minority status would substantially

---

**5.** Many jurisdictions, including this one, have decided the question of determining the fair value of shares when a *dissenting* shareholder elects to request the fair value of his or her shares in case of a merger or consolidation. *See* § 7–1.1–74; *see also Jeffrey v. American Screw Co.,* 98 R.I. 286, 201 A.2d 146 (1964)(appraiser given wide discretion to consider all relevant factors in determining fair value of dissenting shareholder's stock). This is a separate issue from whether a minority discount should be applied when a corporation elects to buy out a shareholder who has petitioned for *dissolution* proceedings.

decrease their value. The court, however, went on to note that this devaluation has little validity when the shares are to be purchased by the corporation. When a corporation elects to buy out the shares of a dissenting shareholder, the fact that the shares are noncontrolling is irrelevant.

In addition the court in *Brown* observed that had the plaintiffs proved their case and had the corporation been dissolved, each shareholder would have been entitled to the same amount per share. There would be no consideration given to whether the shares were controlling or noncontrolling. Furthermore an unscrupulous controlling shareholder could avoid a proportionate distribution under dissolution by buying out the shares, and the very misconduct and unfairness that incited the minority shareholders to seek dissolution could be used to oppress them further. *Brown*, 91 Cal.App.3d at 486–87, 154 Cal.Rptr. at 176; *see also* Note, 1989 Duke L.J. at 269 n.63.

■ We agree with the rationale of *Brown* and hereby adopt the rule that in circumstances in which a corporation elects to buy out a shareholder's stock pursuant to § 7–1.1–90.1, we shall not discount the shares solely because of their minority status.

A second and more difficult issue to resolve is whether a lack of marketability discount should be applied to Charland's shares. This discount is separate from and bears no relation to a minority discount. The courts that have addressed this question are divided.

The California courts have rejected a lack of marketability discount for the same reasons that they have rejected a minority discount. *See Brown*, 91 Cal.App.3d at 483, 154 Cal.Rptr. at 175. That is, no lack of marketability discount should be applied because the shares are not being sold on the open market; they are purchased by the corporation. The New York courts, however, have decided to apply a lack of marketability discount to shares in a closely held corporation when the corporation elects to buy out a minority shareholder in order to avoid dissolution. The reason for applying this discount is that shares of a closely held corporation cannot readily be sold on the public market. *Blake v. Blake Agency, Inc.*, 107 A.D.2d at 149, 486 N.Y. S.2d at 349.

The difference between the approach taken by the New York and the California courts regarding the question of whether a lack of marketability discount should be applied when a corporation elects to buy out the shareholder who has filed for dissolution is based upon the statutes of each state. The California statute determines fair value "on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." Cal. Corp.Code Ann. § 2000(a)(West 1990). As there is no lack of marketability discount if the corporation dissolves, no such discount is applied by the California courts.

The New York statute, like its Rhode Island counterpart, states that the courts are to determine the *fair value* of the shares. *See* N.Y. Bus. Corp. Law § 1118(b)(McKinney 1986); G.L.1956 (1985 Reenactment) § 7–1.1–90.1. A difference between the Rhode Island and the New York statutes, however, is that whereas the New York statute requires the court to determine the value of the shares as of the close of business the *day before* the petition for dissolution is filed, the Rhode Island statute requires the court to use the *end of the business day on the day the petition is filed.* This difference is significant. Indeed, the New York Supreme Court stated that the specific language of the relevant statute required the appraiser to apply a lack of marketability discount in determining the fair value of the petitioner's shares:

"[T]his failure on the part of the Referee to apply an illiquidity discount flies in the face of the clear and unambiguous language of the statute, and this portion of this report cannot be confirmed. Indeed, as indicated above, § 1118(b) of the statute specifically provides that the court shall determine 'fair value of the petitioner's shares as of the day prior to the date on which such petition was filed, exclu-

sive of any element of value arising from such filing.' * * * Furthermore, the explicit language contained in the statute requiring that there be no consideration given to either an increase or diminution in value arising from the filing of the petition, was also violated when an illiquidity discount was not applied." *Matter of Gift Pax, Inc.*, 123 Misc.2d 830, 834, 475 N.Y.S.2d 324, 328 (1984), *aff'd*, 107 A.D.2d 97, 486 N.Y.S.2d 272 (1985).

We believe that the New York statute (and the rule of an illiquidity discount that emanates therefrom) can be distinguished from its Rhode Island counterpart. Section 7–1.1–90.1 states that the valuation should be made at the close of business on the day on which the petition is filed. As the Rhode Island statute specifically allows for consideration of the filing of the petition, the New York cases are distinguishable.

■ Furthermore we believe that independent of any discrepancy between the New York and tbe Rhode Island statutes, a lack of marketability discount is inapposite when a corporation elects to buy out a shareholder who has filed for dissolution of a corporation. As a recent law review article noted:

"In dissolution cases, strong reasons support the use of pro rata value without a discount * * *. A minority shareholder seeking dissolution claims that majority shareholders have engaged in some unfair, possibly tortious, action. If the minority shareholder succeeds in having the company dissolved, all shareholders will receive their pro rata share of the assets, with no account given to the minority [or illiquidity] status of their shares. Minority shareholders should not receive less than this value if, instead of fighting the dissolution action, the majority decides to seek appraisal of minority shares in order to buy out the minority and reduce corporate discord." Note, 1989 Duke L.J. at 269 n.63.

We therefore today adopt the rule of not applying a discount for lack of marketability in § 7–1.1–90.1 proceedings.

Given that we today refuse to apply either a minority discount or a lack of marketability discount to Charland's shares in Country View, one question remains: did the trial justice in fact apply a discount, thereby awarding Charland less than the fair value of his shares pursuant to § 7–1.1–90.1?

We believe that the trial court, in adopting Smith's valuation, did apply a discount that resulted in less than fair value being awarded to Charland. As noted earlier, Smith believed that a minority discount was appropriate. The only reason that Smith refused to apply such a discount, however, was that the only available figures used to reduce the $2 million selling price in 1988 to 1984 were "statistics * * * for personal residences." Smith went on to observe that "the inflationary impact on personal homes vastly exceeded the norm for other parcels of property." Therefore, Smith did not "again discount * * * for minority shareholder diminished capacity, since in effect, the impact of such a discount had already been realized." As we today adopt the principle that no minority discount or lack of marketability discount should be applied in § 7–1.1–90.1 proceedings, we believe that the discounting of Charland's shares by using residential real estate values resulted in Charland's receiving less than fair value.

We therefore remand this case to the Superior Court to determine the fair value of Charland's shares as of September 4, 1984, without applying a discount for either minority status or lack of marketability of his shares in Country View in conformity with the rules set forth herein.