**Paul HENDRICK, in his capacity as trustee**

v.

**Joyce C. HENDRICK, Executrix of the Estate of Jeffrey P. Hendrick et al.**

**Nos. 97–627–Appeal, 98–436–Appeal.**

Supreme Court of Rhode Island.

July 10, 2000.

Bret Jedele, Amato A. Deluca, Providence, for plaintiff.

Lauren E. Jones, Providence, John C. Tibbitts, Daniel P. Carter, Warwick, for defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, J.

In these consolidated appeals, Joyce Hendrick, individually and as executrix of the estate of her late husband, Jeffrey Hendrick, seeks review of two Superior Court final judgments that served to dismiss her eight counterclaims and/or cross-claims asserted against various parties, both plaintiff and defendant, that include the Exeter Country Club, Inc., its officers, directors, stockholders and certain trustees.[1] Those asserted claims alleged, in general terms, breach of fiduciary obligations and duties and majority stockholder oppression. They also sought dissolution of the corporation, or alternatively, the corporate buyout of Joyce's approxi-

---

1. Because most of the parties in this litigation share the last name of Hendrick, we will refer to those parties by their first names and no disrespect is intended. As to Joyce Hendrick, there is no material distinction or significance between her status as an individual plaintiff and as executrix of the estate of her late husband, Jeffrey, and thus for purposes of convenience and clarity, we will hereinafter refer to her without designation of her particular capacity.

mately 30 percent shareholder interest in the corporation pursuant to G.L.1956 §§ 7–1.1–90 and 7–1.1–90.1.

## I

### Case Facts and Travel

The appellate Gordian knot we have before us was created and solidified in the following fashion: Exeter Country Club, Inc. (ECC) is a closely held corporation owned by the Hendrick family and authorized under Rhode Island law to carry on the business of a golf course in the Town of Exeter. As of 1986, Paul Hendrick was a majority stockholder in ECC, and his two sons, Jeffrey and Peter, owned minority interests in ECC. On January 17, 1986, Jeffrey and Peter entered into a reciprocal stock purchase agreement (the purchase agreement), whereupon the death of one brother, the survivor-brother would automatically, by way of such purchase agreement, purchase certain identified ECC stock held by the decedent-brother, through the use of proceeds from life insurance policies held on the life of that decedent-brother.[2] The agreement named both Paul and Rolland Jones (Jones), an insurance agent, as trustees to administer the purchase-agreement transaction. Pursuant to that agreement, the trustees were required to hold Jeffrey's and Peter's shares of stock designated in the purchase agreement in trust, receive the life insurance policies proceeds, deliver the designated stock to the survivor-brother, and deliver the stock purchase proceeds from the purchase-agreement transaction to the particular decedent-brother's executor or representative.

In late December 1990, ECC underwent a process of corporate recapitalization through the issuance to the respective family shareholders of nine shares of Class B nonvoting stock for each Class A voting stock or Class B stock then owned by the shareholders. Additionally, Paul and his wife, Elizabeth, made subsequent gifts to both Peter and Jeffrey of a percentage of the newly issued stock. As a result of the corporate recapitalization and the parental gifts, Jeffrey's Class B equity shares in ECC increased from 1,858 to approximately 22,000 shares. There was some immediate disagreement between the Hendrick family members as to whether the newly issued and newly received shares were to be governed by the 1986 stock purchase agreement executed between Peter and Jeffrey. Legal counsel for trustee Jones opined in an August 1992 letter that because the purchase agreement predated the recapitalization, the recapitalized new shares were not within the parameters of the purchase agreement. On the other hand, ECC's corporate counsel, several years later, reached the opposite conclusion, advising ECC, its directors and the trustees that the purchase agreement was intended to encompass all shares held by Jeffrey at the time of his death.

In June 1993, while Jeffrey was still alive but seriously ill, an attempt was made by ECC and the trustees, through counsel, to revise or amend the 1986 purchase agreement to include those new Class B shares in the purchase agreement, but Joyce, now acting as Jeffrey's "attorney-in-fact," refused to allow the purchase agreement to be modified to include the new shares. Despite this continuing feud over the scope of the purchase agreement, after Jeffrey's death on December 22, 1993, the trustees designated by the purchase agreement attempted a valuation of all shares then owned by Jeffrey and set a purchase closing date in September 1994 for the transfer of all of those shares to Peter. Joyce, the executrix of Jeffrey's estate, disputed the trustees' valuation and purchase attempt of the additional Class B stock owned by Jeffrey, disagreed with the price valuation on that stock as determined by ECC's accountant, and did not attend

---

**2.** Jeffrey's health had been in decline, and his subsequent death apparently was not unexpected. At the time of the purchase agreement, he owned 203 shares of Class A common shares and 1,858 Class B common shares.

the scheduled stock-purchase closing. Subsequently, no attempt was made by the trustees to transfer any of Jeffrey's interest in ECC, although under the purchase agreement the original 1,858 shares could have been transferred by the trustees without the presence or permission of Joyce.

On November 9, 1994, Paul commenced an action in the Washington County Superior Court against Joyce, Jeffrey's estate and Peter,[3] seeking specific performance of the stock purchase agreement. Joyce responded to that complaint by denying that specific performance should be ordered, and filed a counterclaim against Paul in his individual capacity and as trustee, and a crossclaim against Peter, alleging certain breaches of fiduciary duty towards her and waste of corporate assets as a result of actions taken by both Paul and Peter. Over the later course of the litigation, ECC, trustee Jones, later his executrix, Alice Jones[4] and Elizabeth Hendrick, Paul's wife, all were added as parties in the case.[5] The Hendrick family feud not only expanded, but also spilled out of the courtroom into the everyday operations of the corporation, with ever-increasing animosity. In December 1994, ECC declared no dividends on its stock for the year, but instead voted to give Paul a bonus of $65,000 and to give Peter a bonus of $85,000, while Joyce received a bonus amount of only $2,500. The Internal Revenue Service, upon review, subsequently disallowed $40,000 of that bonus amount paid to the ECC corporate officers during 1994.

In March 1995, Paul proceeded on his complaint for a declaratory judgment relating to the purchase agreement. On May 18, 1995, after trial, a Superior Court trial justice issued a declaratory judgment declaring that the January 17, 1986, purchase agreement was unambiguous on its face and did not by its terms include the shares in ECC that Jeffrey had subsequently acquired. He declared that the purchase agreement provided for the sale and purchase of only the original 1,858 shares held by Jeffrey on January 17, 1986, and not to the recapitalization shares and the stock gifts Jeffrey received after that agreement was executed.[6] He ordered those 1,858 shares to be transferred, and severed Joyce's counter and crossclaims for later trial. After the transfer of the 1,858 shares to Peter, pursuant to the May 18, 1995 declaratory judgment, Joyce was left owning approximately 31 percent of the Class B nonvoting shares in ECC. Unfortunately for Joyce, her status as a powerless minority shareholder was merely the beginning of her travails with ECC. In August 1995, Joyce was fired from her position as ECC's bookkeeper after eighteen years of service, for what she claimed was her refusal to convey her remaining stock to ECC and what ECC characterized as her creation of a hostile workplace environment. She also found herself thwarted in her attempts to gain sufficient access to review ECC's corporate books and records. Finally, in January 1996, ECC purchased a $400,000 parcel of land which, although not adjacent or directly beneficial to ECC's property, apparently fronted certain parcels owned jointly by Peter and his wife and son, a transaction that Joyce asserted benefited Peter individually and not the corporation.

On September 2, 1997, the defendants in Joyce's counterclaims and crossclaims moved for summary judgment on Joyce's claims relating to the breach of fiduciary duties owed to her and the issue of excessive bonuses paid to the directors and officers of ECC. While that summary judgment motion was pending, Joyce

---

3. Joyce asserts that the decision to list Paul as sole plaintiff and to list Peter as a codefendant was a mutual decision among the trustees and the directors, including Peter.

4. Rolland Jones died in October 1994.

5. Paul died on April 9, 1998, and no representative of his estate has yet been substituted as a party.

6. That judgment was never appealed.

moved, and was granted leave, to amend both her counterclaims and crossclaims. Upon amendment, her counterclaims and crossclaims alleged common law breach of fiduciary duty on the part of the trustees and ECC by failing to act impartially in their attempts to coerce Joyce into modifying the stock purchase agreement to include all shares owned by Jeffrey at the time of his death; malicious prosecution and abuse of process [7] relating to the specific performance and declaratory-relief civil action filed by Paul against her; oppressive conduct by ECC toward her as a minority shareholder by its failure to declare stock dividends while granting excessive bonuses to its officers and directors, as well as the termination of her eighteen-year long-standing employment relationship with ECC and finally, denying her access to necessary ECC corporate books and records, in violation of § 7–1.1–46. Joyce also alleged shareholder derivative type-claims, asserting that the $400,000 land purchase by ECC was for the primary benefit only of Peter and not the corporation and that the above-described excessive bonuses paid to Paul and Peter operated as a financial drain on the corporate assets. Contained within each count in Joyce's claims were allegations based in part upon § 7–1.1–90.1 as well as common law, and allegations that the acts described in each count amounted to "illegal, oppressive or fraudulent" conduct pursuant to § 7–1.1–90. Her prayers for relief included a demand in the form of a buyout of her corporate shares at fair value by ECC, or, in the alternative, a court-ordered forced liquidation sale of ECC, pursuant to § 7–1.1–90.

On October 21, 1997, a Superior Court motion hearing justice, after hearing on the counter and crossclaim defendants' motions for summary judgment, granted those motions on counts 1, 2, and 5 in the counterclaims and crossclaims. He found that as a matter of law, no coercion had been exerted by the trustees toward Joyce, and that the trustees had acted in good faith reliance on advice of counsel, pursuant to § 7–1.1–33,[8] when they attempted to persuade Joyce to modify the purchase agreement to include all of Jeffrey's outstanding shares. The hearing justice determined that there was no evidence of any disputed material facts concerning whether any corporate assets had been wasted or improperly drained through the payment of the corporate bonuses. The record reveals, however, that the hearing justice failed to address Joyce's claims of oppression under §§ 7–1.1–90 and 7–1.1–90.1.

On June 26, 1998, the defendants moved to dismiss Joyce's remaining counterclaims and crossclaims in a second Superior Court hearing before a different motion justice in that court. The second hearing justice ultimately dismissed with prejudice Joyce's shareholder derivative claims (counts 4 and 7), finding that both causes of action as alleged properly belonged to the corporation, not to Joyce. She also granted summary judgment against Joyce with respect to Joyce's remaining counts (counts 3, 6, and 8), concluding that Joyce had failed to show, in those three counts, the existence of any material issues of

---

7. Joyce has not appealed the dismissal of her *malicious prosecution and abuse of process* claims. She, however, maintains those counts on appeal, insofar as those claims relate to the oppressive pattern alleged against the counterclaim and crossclaim defendants.

8. General Laws 1956 § 7–1.1–33 provides in pertinent part:
"(b) A director shall discharge his or her duties as a director, including his or her duties as a member of a committee:
(1) In good faith;

\*\*\*

(c) In discharging his or her duties, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:
\*\*\*
(2) Legal counsel, public accountants, or other persons as to matters the director reasonably believes are within the person's professional or expert competence \*\*\*."

disputed facts. Alternatively, she found that the trustees were shielded from liability relating to the purchase-agreement transaction by an exculpatory provision contained in the purchase agreement.[9] The hearing justice, it should be noted, only addressed Joyce's claims made pursuant to §§ 7–1.1–90 and 7–1.1–90.1 to the extent that she believed they were not properly pled as causes of action. Joyce has timely appealed the final judgments entered in both those proceedings, and they have been consolidated here for purposes of this appeal.

## II

### The Summary Judgment Motions

It is well settled that "[s]ummary judgment is an extreme remedy that should be applied cautiously." *Sjogren v. Metropolitan Property and Casualty Insurance Co.*, 703 A.2d 608, 610 (R.I.1997) (citing *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I.1996)). "In reviewing the grant of a summary judgment motion, this Court employs the same standard on review as the trial justice. We must examine all of the pleadings, memoranda and affidavits in the 'light most favorable to the party opposing the motion.' " *Truk–Away of Rhode Island, Inc. v. Aetna Casualty & Surety Co.*, 723 A.2d 309, 313 (R.I.1999) (quoting *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 465 (R.I.1996)). We have said on previous occasions that "[i]n reviewing these materials, the motion justice should draw all reasonable inferences in favor of the nonmoving party and must refrain from weighing the evidence or passing upon issues of credibility." *Superior Boiler Works, Inc. v. R.J. Sanders, Inc.*, 711 A.2d 628, 631 (R.I.1998) (citing *Rustigian*

*v. Celona*, 478 A.2d 187, 189 (R.I.1984)). "Accordingly, if our review of the admissible evidence viewed in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and if we conclude that the moving party was entitled to judgment as a matter of law, we shall sustain the trial justice's granting of summary judgment." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I.1996) (citing *Mallane v. Holyoke Mutual Insurance Company in Salem*, 658 A.2d 18, 20 (R.I.1995)).

We are mindful that "[c]orporate officers and directors of any corporate enterprise, public or close, have long been recognized as corporate fiduciaries owing a duty of loyalty to the corporation and its shareholders ***." *A. Teixeira & Co. v. Teixeira*, 699 A.2d 1383, 1386 (R.I.1997). This Court has also recognized that, quite apart from officers and directors, the shareholders themselves in a closely held family corporation may have a fiduciary duty toward one another and to the minority shareholders because of the potential for oppression by the majority toward the minority shareholders by simple virtue of majority voting share power, coupled with the absence of a ready market for a closely held corporation's shares. *See, e.g., Broccoli v. Broccoli*, 710 A.2d 669, 673 (R.I. 1998); *A. Teixeira & Co.*, 699 A.2d at 1386–87; *Long v. Atlantic PBS, Inc.*, 681 A.2d 249, 256 n. 8 (R.I.1996); *Estate of Meller v. Adolf Meller Co.*, 554 A.2d 648, 651–52 (R.I.1989). "Such a [fiduciary] relationship is one of trust and confidence and imposes the duty on the fiduciary to act with the utmost good faith." *Point Trap Co. v. Manchester*, 98 R.I. 49, 54, 199 A.2d 592, 596 (1964).

---

9. Section 8.05 of the purchase agreement provided:

"The Trustees shall have no other duties or obligations hereunder than to hold and receive the proceeds of the insurance and to hold and deliver the Stock Certificates upon receipt of the purchase price therefor. Except as provided in this paragraph, the Corporation and the Stockholders hereby release the Trustees of any and all claims under this Agreement or otherwise. The Trustees shall not be required to take any action for collection of insurance proceeds or against the Corporation for payment of any balance of the purchase price unless indemnified to their mutual satisfaction by the Corporation and/or Stockholders in their discretion."

Recognizing the potential for the freeze out and oppression of minority shareholders, the General Assembly enacted several statutory mechanisms by which such aggrieved shareholders might seek relief. Section § 7–1.1–90, entitled "[j]urisdiction of court to liquidate assets and business of corporation," allows shareholders to seek relief from "illegal, oppressive, or fraudulent" acts of those controlling the corporation:

"(a) The superior court shall have full power to liquidate the assets and business of a corporation:

(1) In an action by a shareholder when it is established that, whether or not the corporate business has been or could be operated at a profit, dissolution would be beneficial to the shareholders because:

(i) The directors or those other persons that may be responsible for management pursuant to § 7–1.1–51(a) are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock; or

(ii) The acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent; or

(iii) The shareholders are deadlocked in voting power, and have failed, for a period which includes at least two (2) consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election of their successors; or

(iv) The corporate assets are being misapplied or are in danger of being wasted or lost; or

(v) Two (2) or more factions of shareholders are divided and there is such internal dissension that serious harm to the business and affairs of the corporation is threatened ***."

Section 7–1.1–90.1, entitled "[a]voidance of dissolution by stock buyout," provides an alternative to the drastic remedy of liquidation by allowing the corporation the option of buying out the aggrieved shareholder's equity interest at fair value:

"Whenever a petition for dissolution of a corporation is filed by one or more shareholders (subsequently in this section referred to as the 'petitioner') pursuant to either § 7–1.1–90 or a right to compel dissolution which is authorized under § 7–1.1–51 or is otherwise valid, one or more of its other shareholders may avoid the dissolution by filing with the court prior to the commencement of the hearing, or, in the discretion of the court, at any time prior to a sale or other disposition of the assets of the corporation, an election to purchase the shares owned by the petitioner at a price equal to their fair value. If the shares are to be purchased by other shareholders, notice shall be sent to all shareholders of the corporation other than the petitioner, giving them an opportunity to join in the election to purchase the shares. If the parties are unable to reach an agreement as to the fair value of the shares, the court shall, upon the giving of a bond or other security sufficient to assure to the petitioner payment of the value of the shares, stay the proceeding and determine the value of the shares, in accordance with the procedure set forth in § 7–1.1–74, as of the close of business on the day on which the petition for dissolution was filed."

By its plain language, § 7–1.1–90.1 thus permits "a corporation, rather than be forced to dissolve by a shareholder dissolution petition, [to] elect to buy out the shareholder's stock." *Charland v. Country View Golf Club, Inc.*, 588 A.2d 609, 610 (R.I.1991). However, fair value must be given for those shares, and "if the fair value cannot be agreed upon, the court shall determine the value of such shares as of the close of business on the day on which the petition for dissolution was filed." *Id.*

■ In the case at bar, we believe that the two motion hearing justices erred by

failing to give substantive consideration to Joyce's pleadings under §§ 7–1.1–90 and 7–1.1–90.1. "Under Rhode Island law, Rule 8 of the Superior Court Rules of Civil Procedure is a liberal-pleading rule." *Bresnick v. Baskin,* 650 A.2d 915, 916 (R.I. 1994) (citing *Haley v. Town of Lincoln,* 611 A.2d 845, 848 (R.I.1992)). "Although a plaintiff is not obligated to 'set out the precise legal theory upon which his or her claim is based,' he or she must provide 'the opposing party fair and adequate notice of the type of claim being asserted.' " *Id.* (quoting *Haley,* 611 A.2d at 848). "The policy behind these liberal pleading rules is a simple one: cases in our system are not to be disposed of summarily on arcane or technical grounds." *Haley,* 611 A.2d at 848.

We note that each count in Joyce's amended complaint alleged conduct on the part of the cross and counterclaim defendants that was "illegal, oppressive or fraudulent," and demanded relief pursuant to §§ 7–1.1–90.1 and 7–1.1–90. While it is undeniable that these pleadings pursuant to §§ 7–1.1–90 and 7–1.1–90.1 could have been framed with more particularity, we believe that they provided the counter and crossclaim defendants with more than sufficient notice of the type of claim that Joyce was asserting against them in her complaint as well as the relief sought. Because the hearing justices failed to address Joyce's claims under §§ 7–1.1–90 and 7–1.1–90.1, summary judgment as to those counts was not appropriate as a matter of law, and consequently must be considered reversible error.

■ Further, we are of the opinion that genuine issues of material fact do exist concerning whether Joyce, as a minority shareholder, was oppressed by the actions of the other ECC shareholders pursuant to both common law and statutory law. We note that the term "oppression" in § 7–1.1–90 has not yet been specifically defined by this Court as it relates to close corporations. "Oppression," however, has been defined by other courts to encompass that

conduct which deviates from a heightened good faith standard that exists in closely held corporations, a more stringent standard than found in their public counterparts. *See, e.g., Tomaino v. Concord Oil of Newport, Inc.,* 709 A.2d 1016, 1021 (R.I. 1998); *Donahue v. Rodd Electrotype Company of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505, 515 (1975) (oppressive conduct found where stockholders in a close corporation did not "discharge their management and stockholder responsibilities in conformity with this strict good faith standard"); 19 Am.Jur.2d *Corporations,* § 2766 (1986) (oppression defined "as burdensome, harsh or wrongful conduct, a visible departure from the standards of fair dealing or fair play ***. It also constitutes a breach of the fiduciary duty of good faith and fair dealing owed by the majority shareholders to the minority").

Alternatively, a more recent trend has been to define oppressive conduct as conduct "that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the closed corporation." *In re Rambusch,* 143 A.D.2d 605, 533 N.Y.S.2d 423, 425 (N.Y.App.Div.1988). "This approach takes into account the fact that shareholders in close corporations may have expectations that differ substantially from those of shareholders in public corporations." *Muellenberg v. Bikon Corp.,* 143 N.J. 168, 669 A.2d 1382, 1387 (1996). The reasonable expectation analysis also recognizes the fact sensitive nature of judicial inquiry into this area and the need to "examine the understanding of the parties concerning their role in corporate affairs." *Id.*

Likewise, oppressive conduct can manifest itself in a range of actions designed to disadvantage or freeze out a minority shareholder. The majority shareholders " 'may refuse to declare dividends; they may drain off the corporation's earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps their relatives *** [and] they may

deprive minority shareholders of corporate offices and of employment by the company.' " *Donahue,* 328 N.E.2d at 513; *Giannotti v. Hamway,* 239 Va. 14, 387 S.E.2d 725, 731–32 (1990). Oppression also has been found to exist where the majority shareholders have engaged in waste of the corporate assets, *Muellenberg,* 669 A.2d at 1388, or where relevant financial information is withheld from shareholders. *See generally* 19 Am.Jur.2d *Corporations,* § 2767 (1986), for a check list of oppressive acts.

Whether in this case the existence of oppressive conduct is viewed under a heightened good faith or reasonable expectation analysis, we conclude that both motion hearing justices erred by granting summary judgment in favor of the counterclaim and crossclaim defendants on the issue of oppression when genuine issues of material fact were particularly raised by Joyce's submissions of affidavits and pleadings. After reviewing the record before us, we believe a determination of whether Joyce, as a minority shareholder, has been the victim of oppression appropriately can be made only at a hearing in which she will have opportunity to fully develop and present the facts relevant to her claims.

In reaching that conclusion, we are mindful that, as discussed *infra,* oppression within a closely held corporation can manifest itself as a series of acts or a pattern of conduct by majority shareholders that can have the cumulative, overall effect of freezing out or depriving the minority shareholder of a voice in the corporation, as well as manifesting itself in more distinct, identifiable actions. We note that even in the absence of demonstrable oppression, we have upheld a Superior Court trial justice's determination that a forced buyout of a minority shareholder's shares pursuant to § 7–1.1–90.1 was warranted when there appeared no prospect for harmony between the shareholders and long-term injunctive control of the actions of the majority shareholders was not practi-

cable. *A. Teixeira & Co., v. Teixeira,* 674 A.2d 407 (R.I.1996). We believe that the hearing justices, however, "missed the forest for the trees" in their inquiry, and instead focused exclusively on each count, to the exclusion of an appropriate broader inquiry into an alleged pattern or series of acts by the ECC majority shareholders that a fact-finder reasonably could conclude therefrom rose to the level of oppression toward Joyce as alleged in her counterclaims and crossclaims. Further, we believe that the hearing justices inappropriately made factual determinations concerning those various issues of fact raised by Joyce. We emphasize that the correct judicial role in a summary judgment motion hearing is simply to identify disputed material fact issues, and not to resolve them. *Superior Boiler Works, Inc. v. R.J. Sanders, Inc.,* 711 A.2d 628, 632 (R.I.1998).

Viewing the evidence here in the light most favorable to Joyce, we are persuaded that Joyce has demonstrated at least an arguable case that oppression against her and Jeffrey's estate existed within ECC, and has demonstrated that more than one reasonable inference could be drawn from the various actions and pattern of conduct manifested by ECC and its officers and directors. Among Joyce's allegations that present several material disputed factual questions are (1) whether the ECC directors, officers or stockholders acted coercively—violated Joyce's reasonable expectations as a minority shareholder or otherwise manifested bad faith in their dealings with her relating to the purchase agreement, given the existence of the contradictory legal opinions by counsel for one of the trustees and counsel for ECC about the scope of the purchase agreement and the trial justice's specific finding and the final judgment in the unappealed declaratory judgment portion of this litigation; (2) whether the bonuses awarded were excessive, given the discrepancy of the bonus award between the minority shareholder and the majority faction, given the IRS's

subsequent disallowance of part of that bonus amount, and in light of ECC's decision not to declare dividends to stockholders; (3) whether ECC breached its fiduciary duty toward Joyce by terminating her employment in retaliation for her continued participation in the litigation against ECC, and (4) whether the corporate records and books provided to Joyce were adequate for proper purposes pursuant to § 7–1.1–46, given the evidence presented of their apparent paucity and questionable accuracy. Further, we conclude that a material factual issue exists as to the scope of the exculpatory clause in the purchase agreement and whether that clause shielded any of the crossclaim and counterclaim defendants in their roles as directors, officers or shareholders relating to the stock purchase-agreement transaction.

## III

### The Motion to Dismiss

Two of the counts in Joyce's complaint (counts 4 and 7) alleged shareholder derivative-type actions relating to the payment of bonuses to Peter and Paul and the purchase of the $400,000 land parcel. Joyce asserted that by these two actions, the majority shareholders caused ECC to waste or misapply corporate assets and failed to seek recovery of those amounts. The second hearing justice, acting on the cross and counterclaim defendants' motions to dismiss, found that as derivative claims, both counts were improperly pleaded pursuant to Rule 23.1 of the Superior Court Rules of Civil Procedure. The cross and counterclaim defendants had filed Super.R.Civ.P. 12(b)(6) motions to dismiss those counts and also filed motions for summary judgment on the same counts. At the motion hearing, the hearing justice, without objection by either counsel, decided the motions pursuant to the standard employed in determining a Rule 12(b)(6) motion to dismiss. She concluded "based upon the standards for granting a 12(b)(6) motion, the court grants the cross and counterclaim defendants' motions to dismiss." *Cf. Cipolla v. Rhode Island College Board of Governors for Higher Education,* 742 A.2d 277, 280 (R.I.1999) (holding that a motion to dismiss must be made strictly on the pleadings, and a Rule 12 motion to dismiss that relies on matters outside the pleadings must be treated as a motion for summary judgment).

In reviewing a hearing justice's grant or denial of a Rule 12(b)(6) motion to dismiss, we undertake the same analysis as used by the hearing justice. "A motion to dismiss under Rule 12(b)(6) will only be granted 'when it is clear beyond a reasonable doubt that the plaintiff would not be entitled to relief from the defendant under any set of facts that could be proven in support of the plaintiff's claim.' " *Bruno v. Criterion Holdings, Inc.,* 736 A.2d 99, 99 (R.I.1999) (quoting *Folan v. State,* 723 A.2d 287, 289 (R.I.1999)). "In reviewing a motion to dismiss under Rule 12(b)(6), we accept the allegations of the plaintiff's complaint as true and view them in the light most favorable to the plaintiff." *Id.* (citing *Folan,* 723 A.2d at 289).

■ After reviewing the record before us, we are of the opinion that the hearing justice properly dismissed the derivative claims. Rule 23.1 provides in pertinent part:

"In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if neces-

sary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

We note in particular that Rule 23.1 requires that the complaint allege *with particularity* the efforts made to secure the desired corporate action or the reasons why such efforts were not made. Although such efforts may indeed prove ultimately futile, the plain language of the rule requires that a plaintiff demonstrate that all avenues of redress are foreclosed before a derivative suit may be brought. Consequently, because Joyce's claims chronicle no such attempts to secure action by ECC and set forth no reasons for her failure to demand such corrective action, those counts were properly dismissed pursuant to Rule 12(b)(6).

More problematic, however, is the hearing justice's decision to dismiss those derivative claims with prejudice. Although it is well settled that leave to amend a defective pleading is committed to the sound discretion of the hearing justice, *see Babbs v. John Hancock Mutual Life Insurance Co.*, 507 A.2d 1347, 1349 (R.I. 1986), "we have consistently held that Rule 15(a) liberally permits amendment absent a showing of extreme prejudice." *Wachsberger v. Pepper*, 583 A.2d 77, 78 (R.I.1990) (citing *Inleasing Corp. v. Jessup*, 475 A.2d 989, 993 (R.I.1984)). Further, we have held that the burden rests on the party opposing the motion to amend to demonstrate the existence of such extreme prejudice. *Babbs*, 507 A.2d at 1349. After reviewing the hearing record, we are of the opinion that the counterclaim and crossclaim defendants failed to show in any manner how they would be substantially prejudiced by Joyce's amending of her derivative claims. Absent such a showing, we conclude from the record that the hearing justice in reaching her decision was apparently influenced by what counsel for

the counterclaim and crossclaim defendants had asserted was the first hearing justice's position and holding foreclosing any further amendments to the case pleadings. Counsel informed the hearing justice that the first hearing justice had warned the parties that he would deny any future attempts to amend the pleadings that could prejudice the parties and delay the litigation.[10] However, we have said that mere delay is insufficient reason for denying a party's request to amend his or her pleading to avoid a Rule 12(b)(6) dismissal. *Inleasing Corp.*, 475 A.2d at 993.

## IV

### Conclusion

In remanding the papers in this case to the Superior Court, we note "[i]f ever there was a case in which a remedy should be fashioned, this is such a controversy." *Cheetham v. Cheetham*, 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979). We believe that these notable words ring particularly true for the case now before us. For purposes of severing the tangled Gordian knot that has been strangling the litigants in this case for more than five years, this Court now looks to its inherent supervisory and revisory powers, pursuant to *Cheetham*, for Alexander the Great's proverbial sword such that we may fashion a fair, yet appropriately sharp-edged remedy to cut through this protracted family feud and thus achieve a final and fair conclusion to this litigation.

Accordingly, pursuant to our plenary authority, our remand is made with the following directions to the Superior Court to proceed:

(a) To conduct an evidentiary hearing to determine whether Joyce is entitled to dissolution of ECC pursuant to § 7–1.1–90, or in the alternative, to determine whether Joyce is entitled to a buyout of her shares

---

**10.** Actually what the first hearing justice had said was: "And I will not—I don't care what the contents of it was, I will not accept any-

thing late in this matter beyond today's date from anybody."

by ECC pursuant to § 7–1.1–90.1. In the event that the hearing justice concludes that ECC is to be dissolved, he or she shall appoint a receiver to effect such liquidation and to pay a liquidation dividend to each shareholder. Any statutory interest on Joyce's liquidation dividend will accrue from November 30, 1994, being the date of the initial demand for liquidation of ECC made by both the estate of Jeffrey Hendrick and Joyce Hendrick in count 8 of their respective counterclaims and count 1 of their respective crossclaims. *See A. Teixeira & Co.*, 674 A.2d at 408; *Charland*, 588 A.2d at 610.

In the alternative, if a buyout of Joyce's shares by ECC is found to be warranted, the trial justice is instructed to appoint an appraiser to determine the fair value of such shares. To that fair value amount shall be added statutory interest computed from November 30, 1994. The combined total of both fair value and interest shall constitute the final purchase price for Joyce's shares.[11]

(b) The judgment dismissing Joyce's derivative claims (counts 4 and 7) with prejudice is to be vacated, and the dismissal of those claims will be noted as having been dismissed without prejudice with leave to amend.

(c) If the hearing justice determines that Joyce is not entitled to dissolution of ECC pursuant to § 7–1.1–90 or to a buyout of her shares by ECC pursuant to § 7–1.1–90.1, we direct that Joyce's common law and statutory claims in her amended complaint shall then proceed to trial and shall be accorded priority status on the appropriate trial calendar.

For the foregoing reasons, the plaintiff's consolidated appeal is sustained, and the judgments of the Superior Court appealed from are vacated. The papers in this case are remanded to the Superior Court for further proceedings in accordance with this opinion.

11. We are mindful that § 7–1.1–90.1 provides for statutory interest on the share purchase price to accrue "from the date of the filing of the election to purchase the shares ***." Given the protracted nature of the proceedings before us, however, and pursuant to our inherent power to fashion a fair and conclusive remedy, *Cheetham v. Cheetham*, 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979), we believe that the date of the initial demand for ECC's dissolution serves as the most appropriate historical event in these proceedings for the commencement of the accrual of statutory interest.