DECISION
Before this Court are cross-motions[1] for summary judgment on Count One of the Plaintiffs' complaint which seeks a declaration that the Plaintiffs may exercise their rights under G.L. 1956 § 7-1.2-1202, entitled "Rights of Dissenting Shareholders" (Dissenter's Rights Statute). This statute sets forth a procedure for shareholders of a corporation to receive payment of the "fair value" of their shares when that corporation merges or transfers substantially all of its assets.See § 7-1.2-1201 (setting forth circumstances under which a shareholder may exercise its rights to dissent and receive fair value). The Plaintiffs are four individuals who formerly owned shares in R.I.S.A.T., Inc. (RISAT), a Rhode Island corporation. The Defendants are RISAT and *Page 2 
Discovery House-Group Inc. (DHG), a Delaware corporation[2] which was a party to a merger and which became the sole shareholder of RISAT as a result of the merger.
 I Facts and Travel
RISAT is a Rhode Island corporation which operates substance abuse treatment facilities. (Aff. of David L. Piccoli, II, ¶ 3.) Prior to the merger in question, the four Plaintiffs collectively owned approximately 19% of the outstanding stock of RISAT. On November 22, 2006, RISAT sent a notice to all of its shareholders about a proposed merger with DHG, which similarly operates substance abuse treatment facilities through subsidiaries in Indiana, Maine, Pennsylvania, Rhode Island, and Utah.Id. ¶¶ 4, 9, 10.[3] That notice stated, inter alia, that a shareholder meeting would be convened on December 12, 2006 for the purpose of voting on the proposed merger. Id. ¶ 12. That mailing also included an Executive Summary which described the effects of the merger.Id. ¶ 10-11. The Executive Summary included a description of the shareholders' rights and obligations under the Dissenter's Rights Statute. (Executive Summary 16-17, Ex. A to Def's Mem. Opp. Summ. J., Jun. 8, 2007.) (Executive Summary).
In the weeks leading up to the merger, a meeting was arranged for December 5, 2006. The Plaintiffs claim that an appraiser, who was hired by the Defendants, was supposed to attend and answer questions about appraisals performed in connection with the proposed merger. For reasons which are not apparent on this record, that appraiser did not attend the meeting. *Page 3 
The Plaintiffs state that because they had not obtained sufficient information to evaluate the merits of the merger, they decided to oppose the merger on that basis. Therefore, on December 11, 2006, Plaintiffs' counsel notified RISAT that they intended to oppose the merger, to exercise their dissenting shareholder rights, and not to attend the upcoming shareholder meeting. (Letter of Lundsten to Mackie, Dec. 11, 2006, Ex. D to Pl's Mot. Summ. J., May 25, 2007.)[4]
At the December 12, 2006 shareholder meeting, the Plaintiffs did not attend and voted against the proposed merger via proxy. The merger was approved over their objection, however. On December 19, 2006, the Plaintiffs, through their counsel, sent a letter to RISAT which demanded payment of fair value under the terms of the Dissenter's Rights Statute. (Letter of Lundsten to Mackie, Dec. 19, 2006, Ex. E to Pl's Mot. Summ. J.)[5]
The merger took the form of a so-called "reverse triangular" merger.[6] Prior to the events in question, DHG caused a Maine corporation, R.I.S.A.T. Acquisition Inc. (Acquisition), to be created. (Executive Summary 2, 6.) DHG capitalized Acquisition *Page 4 
with shares of DHG stock, which were the sole assets of Acquisition. DHG was the sole shareholder of Acquisition. Id. On the effective date of the merger, which turned out to be January 1, 2007, Acquisition merged into RISAT. RISAT was the surviving corporation and Acquisition ceased to exist. Id. at 6. As a result, DHG then became the sole shareholder of RISAT, owning 5000 shares, and the former shareholders of RISAT would receive shares of DHG in consideration of their former shares of RISAT.Id. at 7.[7]
In a letter dated Friday, January 5, 2007, which Plaintiffs claim to have received on Monday, January 8, 2007, RISAT sent letters to each of the four Plaintiffs stating that "you are entitled to payment as provided in the Dissenters' Rights Act. . . ." (Ex. D. to Def's Mem. Opp. to Summ. J.) Enclosed with those letters were balance sheets and profit and loss statements as required by the Dissenter's Rights Statute. See § 7-1.2-1202(c). In those letters, RISAT offered each Plaintiff a sum of money deemed by the corporation to be the "fair value" of the Plaintiffs' shares of RISAT. Id.[8]
That letter also stated that
 "If you would like to accept this offer, please send your shares of RISAT common stock and your written acceptance to [name and address omitted].
 Regardless of whether you desire to accept the offer described above, your shares should be sent to the address above for notation as required by the Dissenters' Rights Act." Id.
The preceding sentence was referring to § 7-1.2-1202(h), which provides that "[w]ithin twenty (20) days after demanding payment for his shares, each shareholder demanding payment shall submit the certificate or certificates representing his shares to the *Page 5 
corporation for notation on the certificate that the demand has been made." Since the Plaintiffs made their demand on December 19, 2006, this twenty day time period expired on or about Monday, January 8, 2007 — the same day the Plaintiffs claim to have received the offer letter.
It is undisputed that none of the four Plaintiffs submitted their share certificates by January 8, 2007. In a letter dated January 24, 2007, RISAT took the position that, because the certificates had not been submitted for notation, RISAT had the option to terminate the Plaintiffs dissenter's rights. (Letter of Rinehart to Lundsten, Jan. 24, 2007, Ex. H to Pl's Mot. Summ. J.) (termination letter). Therefore, RISAT was exercising its option to terminate the Plaintiffs' rights under the statute. See § 7-1.2-1202 (providing that if the certificates are not submitted for notation within 20 days of the written demand, the shareholder's "failure to do so may, at the option of the corporation, terminate his or her rights under this section unless a court of competent jurisdiction, for good and sufficient cause shown, directs otherwise").
Plaintiffs Michael Russo and Louis Perrotta had submitted their share certificates on January 22, 2007 — prior to the termination letter, but after the twenty day statutory period had expired. (Letter of Rinehart to Lundsten, Jan. 24, 2007, Ex. H to Pl's Mot. Summ. J.) Plaintiff Walter Parrillo submitted his stock certificate(s) immediately following the termination letter. (Letter of Lundsten to Rinehart, Jan. 25, 2007, Ex. I to PL's Mot. Summ. J.) Plaintiff Gloria Pecunioso apparently lost her stock certificate(s), and requested a lost certificate affidavit from RISAT on February 2, 2007. (Letter of Lundsten to Rinehart, Feb. 2, 2007, Ex. J. to Pl's Mot. Summ. J.; Piccoli Aff. ¶ 23.) *Page 6 
In spite of the purported termination of the Plaintiffs' dissenting shareholder rights, RISAT maintained its offer to purchase the shares at the previously offered price. (Letter of Rinehart to Lundsten, Jan. 24, 2007, Ex. H to Pl's Mot. Summ. J.) The Plaintiffs were not satisfied that those values were fair, however.[9] Following a further exchange of correspondence, unsuccessful attempts by the Plaintiffs to receive more information relative to the appraisal, and ultimately a failure to agree on the fair value, the Plaintiffs requested that RISAT bring a civil action to determine the fair value. See § 7-1.2-1202(e) (requiring that a dissenting shareholder first request that a corporation bring such an action, and providing that if the corporation refuses, the dissenting shareholder may bring such action). RISAT refused to do so, and the Plaintiffs brought the present action.
The Plaintiffs seek summary judgment on Count One of their complaint, which seeks a declaration that they are entitled to exercise their rights as dissenting shareholders. Assuming that they are entitled to such a payment, the remainder of their complaint seeks an appraisal of their shares pursuant to § 7-1.2-1202(e) and a money judgment against RISAT in an amount equal to the fair value of their shares.
The Defendants argue that the statute requires strict compliance with its provisions, and that the Plaintiffs' failure to adhere to its deadlines is fatal to their exercise of their dissenters' rights. The Plaintiffs have made various arguments as to why *Page 7 
the delays, of relatively short duration, are not fatal to their claims for the fair value of their shares.
 II Standard of Review
Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law." Super. Ct. R. Civ. P. Rule 56(c). The Court "does not pass upon the weight or the credibility of the evidence," but instead it must consider the evidence "in a light most favorable to the party opposing the motion." Palmisciano v. Burrillville Racing Ass'n,603 A.2d 317, 320 (R.I. 1992). The Court's role at this stage is only to identify pertinent factual disputes, and not to resolve those disputes.Rotelli v. Catanzaro, 686 A.2d 91 (R.I. 1996). For that reason, summary judgment is a remedy that should be cautiously applied. Id. However, "[i]f there are no material facts in dispute, the case is ripe for summary judgment." Richard v. Blue Cross Blue Shield, 604 A.2d 1260,1261 (R.I. 1992).
 III Whether the Plaintiffs May Be Excused for their Delay
The Court begins by stating the purpose, which is made obvious by the statutory text, of the requirement that dissenting shareholders submit their shares to the corporation "for notation on the certificate that the demand has been made." Section 7-1.2-1202(h); see Providence JournalCo. v. Rodgers, 711 A.2d 1131, 1134 (R.I. 1998) (stating that the Supreme Court will interpret a statute in a manner "that is most consistent with its policy or obvious purpose"). The purpose of this requirement is to give notice to third parties, *Page 8 
who might be inclined to purchase such certificates, that demand has been made. See Greco v. Tampa Wholesale Co., 417 So. 2d 994, 998 (Fla. Dist.Ct.App. 1982). As a result of the demand, a third party transferee can obtain only whatever rights the original dissenting shareholder had, which rights do not include voting the shares, receiving dividends, or any other rights of a shareholder. See §7-1.2-1202(a), (h). But see § 7-1.2-1202(b) (providing certain limited circumstances, such as agreement between the corporation and shareholder, under which a demand may be withdrawn and shareholder status restored). Such a transferee cannot even realize any appreciation in the value of the corporation, because the fair value of the shares is fixed as of the date prior to the merger or corporate action which gave rise to the dissenting rights. Therefore, without notice of the demand, a third party purchasing the certificate could be misled about the rights it is obtaining and expose the corporation "to a third-party claim inconsistent with the dissenter's demand for payment."Greco, 417 So. 2d. at 998.
In order to prevent such an occurrence, the legislature provided corporations with a tool to encourage dissenting shareholders to tender their shares for notation. Unless a court directs otherwise "for good and sufficient cause shown," a corporation can terminate the dissenting shareholder rights if the share certificates have not been submitted for notation within twenty days of the written demand. Section7-1.2-1202(h).
The Plaintiffs first argue that, because their shares in RISAT were cancelled on January 1, 2007 as a result of the merger, they were not required to tender their shares to the corporation. Alternatively, they argue that they have demonstrated "good and sufficient cause" for the Court to excuse their delay in submitting their shares. *Page 9 
 A. Whether Certificates Representing Cancelled Shares Must be Submitted for Notation
The Plan of Merger states that "by virtue of the Merger and without any action on the part of the holders of RISAT capital stock, all shares of capital stock of RISAT issued and outstanding immediately prior to the Effective Date shall be deemed cancelled as of the Effective Date" which was January 1, 2007. (Agreement and Plan of Merger, Art. V, Ex. A to Pl's Mot. Summ. J.) The Plaintiffs argue that as of that date, they no longer owned shares in RISAT and, therefore, did not possess any "certificate or certificates representing [their] shares" which they could present to the corporation for notation. See § 7-1.2-1202(h). Rather, all that they owned were shares in DHG pursuant to the merger, and they had not yet received certificates for those shares.See § 7-1.2-608(a), (f) (providing that shares of stock may, but need not be represented by certificates as determined by the board of directors, and that holders of certificated and uncertificated shares possess the same rights as shareholders unless otherwise provided by law).
Of course, as a result of their invocation of the Dissenter's Rights Statute, the Plaintiffs would not be entitled to vote or exercise any other rights of a shareholder of DHG. Section 7-1.2-1202(a). However, it appears that they still would retain an ownership interest in such shares until they received payment of their fair value. See §7-1.2-1202(d), (e) (providing that certificates must be surrendered upon payment of the agreed value, or the judgment determining fair value, and that upon payment the shareholder ceases to have any interest in the shares). Moreover, under certain conditions provided in § 7-1.2-1202(b), shareholder status could be "restored." Therefore, the Plaintiffs argue that because they did not possess "certificates representing [their] shares" *Page 10 
as a result of the merger, there is good cause for failing to submit such certificates for notation.
The Court begins by assuming that the statutory text "certificate or certificates representing his shares" is ambiguous in the context of a merger such as the one at issue here, where shares are cancelled and replaced with shares in a different corporation. Cf. W.P. Assocs. v.Forcier, Inc., 637 A.2d 353, 356 (R.I. 1994) (finding a contract ambiguous only "when it is reasonably and clearly susceptible to more than one interpretation"). It is possible that the certificates referenced in the statute could mean either certificates for the post-merger corporation (DHG) or certificates for the pre-merger corporation (RISAT). When interpreting a legislative enactment that contains ambiguous language, the Court must "construe the enactment so as to effectuate the intent of the Legislature. . . . examin[ing] statutory provisions in their entirety [and] attributing to the act the meaning most consistent with the policies and purposes of the Legislature." Providence Journal Co, 711 A.2d at 1134.
Even assuming that the phrase "certificate or certificates representing his shares" is reasonably susceptible to the Plaintiffs' proffered interpretation, the Court finds such an interpretation to be an unreasonable one. It would be very unusual for a corporation to issue certificates in a post-merger corporation to shareholders who have dissented from the merger, seek payment for their shares, and desire not to become shareholders in the post-merger corporation. Such a procedure would be a waste of time and money because once fair value is determined, either judicially or by agreement, the shareholders will no longer have any ownership interest in the new corporation and must surrender those certificates. *Page 11 
It is conceivable that Plaintiffs could seek to be issued certificates for their shares in the post-merger corporation, DHG — with a notation that such shares are subject to a demand — only for the short time period necessary to resolve a valuation dispute. Even so, they would still possess a number of certificates which purport to represent shares in the pre-merger corporation, RISAT. Such shares "are personal property and transferable," § 7-1.2-609(a), and could theoretically be transferred to an unwitting third party. The corporation and the public have an interest in having such certificates tendered to the corporation to avoid prejudicing a third party who was unaware of the merger and the exercise of dissenter's rights. Therefore, the Court finds that the legislature intended such certificates to be removed from the stream of commerce, regardless of the effect of the merger on the shares represented by such certificates, to avoid prejudice to any third parties.[10]
For these reasons, the Court finds that the proper interpretation of § 7-1.2-1202(h) is to require that certificates representing the shares in the pre-merger corporation be submitted to the post-merger corporation, whether or not those shares have been cancelled as a result of the merger. The corporation may then make notation that the shares are subject to demand, or in the case where those shares are cancelled, simply destroy the certificates. Therefore, the fact that the Plaintiffs' shares were cancelled is not good and sufficient cause to excuse the delay in tendering the certificates under § 7-1.2-1202(h). *Page 12 
As a legal matter, such shareholders might then be entitled to the issuance of new certificates in the post-merger corporation which contain a notation that demand has been made. See § 7-1.2-608(a) (entitling a shareholder to receive a certificate for his shares). As a practical matter, however, it is difficult to see why such certificates would be necessary, since those certificates must be surrendered once fair value is determined and payment made under the Dissenter's Rights Statute. See § 7-1.2-1202(d), (e). In any case, however, the shareholders must tender their certificates.
 B. Good and Sufficient Cause
The Plaintiffs also argue that even if they were required to tender the certificates representing their former shares in RISAT, good and sufficient cause exists to prevent the Defendants from terminating the Plaintiffs' dissenting shareholder rights. Neither the parties nor the Court have found any Rhode Island decisions interpreting the "good and sufficient cause" language. However, the Dissenter's Rights Statute is derived from § 81 of the 1969 Model Business Corporations Act, which was or remains in force in many jurisdictions. Therefore, the Court will look to the decisions of jurisdictions which have enacted § 81 in order to interpret the Rhode Island enactment.
The highest court in West Virginia has decided the same issue as the case at bar in Matter of Fair Value of Shares of Bank of Ripley. 399 S.E.2d 678 (W.Va. 1990). In that case, the dissenters' attorney admittedly had misread the statute, which was substantially the same as the Rhode Island statute. Id. at 682. As a result, the shareholders did not tender their shares until fifteen days after the statutory deadline.Id. The Plaintiffs argued that the combination of a complex statute, the attorney's misreading of that *Page 13 
statute, a relatively short delay and the absence of prejudice to the corporation constituted "good and sufficient cause" to excuse the fifteen day delay. Id.
Although the court agreed that the statute was "not a model of clarity," it found that it need not consider whether the complexity of the statute, nor the attorney's misreading of that statute, amounted to "good and sufficient cause." Id. at 683. Instead, the court held that "where a dissenting shareholder has otherwise complied with [the Dissenter's Rights Statute] but has failed to timely tender his shares for notation as required by. . . the foregoing statute, his failure will not terminate his dissenter's rights if the delay is insubstantial and the corporation is shown not to have suffered any prejudice."Id. at 684. Finally, the court found a fifteen-day delay to be insubstantial, but remanded the case for further consideration of the prejudice issue. Id. at 684, 686.
The court noted that the statutes providing for mergers and dissenter's rights had replaced the common law rule which formerly required unanimous consent among the shareholders in order to merge or consolidate. See id. at 682. As a result, it noted that dissenter's rights statutes — which are usually held to be the exclusive remedy for dissenting shareholders — are generally construed in favor of the shareholder where the corporation has not been prejudiced. Seeid.; Greco, 417 So. 2d at 998 (also finding that such statutes are to be "liberally" construed in favor of the shareholder).[11] This Court finds that the reasoning in the Bank of Ripley case is sound and that, if presented with the question, the Rhode Island Supreme Court would likely adopt its reasoning. *Page 14 
The Bank of Ripley court did not find that there was good causefor the delay — an attorney's oversight would likely not be considered a good cause. However, in light of the underlying purposes of the notation requirement, that court essentially found good cause for excusing thedelay where that delay was insubstantial and no prejudice to the corporation occurred. Therefore, in light of the purpose of the tender/notation requirement, as well as the policy of construing such statutes in favor of a dissenting shareholder, the Court similarly finds that there is "good and sufficient" cause to excuse a delay when the delay is insubstantial and there is no showing of prejudice to the corporation. Moreover, the Court finds that lost certificates may also constitute good cause. See Albany-Plattsburgh United Corp. v. Bell, 202 A.D.2d 800, 802-803 (N.Y.App.Div. 1994) (finding that lost shares, after having exercised due diligence to find them, coupled with no prejudice to the corporation, constituted "good and sufficient cause").
The Defendants have relied upon authority which holds that statutes in derogation of the common law should be "strictly" construed.See, e.g., Pastore v. Samson, 900 A.2d 1067, 1078 (R.I. 2006) (construing a statutory privilege for peer-review reports about doctors "strictly" in favor of the common law rule of disclosure); Kelly v.Marcantonio, 678 A.2d 873, 876 (R.I. 1996) ("strictly" construing a statutory definition, and therefore narrowing the circumstances under which a "discovery rule" would toll a statute of limitations, because at common law there was no "discovery rule"). They argue that this canon of construction should compel this Court to "strictly" enforce the 20 day deadline. The Defendants have misconceived the purpose of this canon of construction, however. Where a statutory term was ambiguous, our Supreme Court has *Page 15 
uniformly resolved that ambiguity in favor of the pre-existing common law rule. Likewise, where this Court must ascertain the meaning of "good and sufficient cause," it will also resolve any doubt in favor of the common law rule. That rule, which required unanimous consent of shareholders to a merger, indisputably represents a policy that shareholders ought to be protected from the effects of an unwanted merger.
Other cases cited by the Defendants, which interpret similar statutory provisions, have not persuaded this Court that a different interpretation of the "good and sufficient cause" requirement is required. For example, in Pritchard v. Mead, the court declined to find "good and sufficient cause," reasoning that "[s]ubmitting stock certificates for notation formalizes the final offer by the corporation and the final objection by the dissenting shareholder and is a prerequisite to the court's involvement in the valuation process."455 N.W.2d 263, 267 (Wis.Ct.App. 1990).
This Court respectfully disagrees with the reasoning inPritchard because other parts of the statute adequately serve these functions. The corporation's offer is formalized by the requirement in § 7-1.2-1202(c) that a corporation give written notice of the corporate action, including an offer for a specified sum in exchange for the shares, within 10 days after the action is effected. The notation requirement is also unnecessary to finalize the dissenter's objection, which is perfected by the demand requirement. A dissenting shareholder must file a written objection before the vote on the action, and then make a written demand after the vote, in order to exercise its rights.See § 7-1.2-1202(a).[12] Therefore, a corporation has no need to receive stock certificates for notation in order to determine the class of objecting shareholders — it need only look to any written *Page 16 
objections and demands received. Finally, it is not accurate to state that tendering the share certificates is a prerequisite to the court's involvement in the valuation process — a corporation may elect not to terminate the dissenters' rights, in which case the valuation proceeding may go forward without a tender of certificates for notation.
In sum, requiring the that stock certificates be submitted for notation serves only to protect third parties from unwittingly purchasing shares which are subject to a demand for fair value and, indirectly, to protect corporations from the effects of such transactions. The requirement was never intended to serve the functions identified in the Pritchard decision. Therefore, the Court finds that the holding in Bank of Ripley properly applies the purposes of the statute and correctly balances the competing interests of shareholders and corporations.
Moreover, as pointed out in Bank of Ripley, the facts inPritchard are distinguishable from the case at bar. Even on the date that the appeal in Pritchard was filed, the shareholder still had not submitted his shares for notation, nor had he offered any explanation for the omission. 455 N.W.2d at 267; see also In Re Glosser Bros.Inc., 555 A.2d 129, 143-44 (Pa.Super.Ct. 1989) (similarly refusing to recognize a dissenting shareholder's rights where the shareholder had neither submitted his shares for notation nor provided an explanation for the omission, but allowing for the possibility that a deminimis technical deviation from the statute's requirements would constitute "good and sufficient cause").[13] Similarly, this Court would be less inclined to find "good and *Page 17 
sufficient cause" if the shareholders continually failed to turn over the certificates for notation, especially if the corporation made repeated requests of the shareholders to do so. Therefore, the facts of this case are distinguishable from the facts in both Pritchard andGlosser Bros., Inc., but to the extent that the reasoning of those cases would compel a different interpretation of the "good and sufficient cause" requirement, the Court finds that reasoning unpersuasive.
Finally, Defendants rely upon two cases, construing dissimilar statutes from Delaware, in which a shareholder was barred from exercising his dissenting shareholder rights because he failed to make timely demand. See Alabama By-Products Corp. v. Cede Co. ex rel.Shearson Lehman Bros., 657 A.2d 254, 263 (Del. 1995) ("We do not insist on statutory compliance merely for the sake of formality. By exacting strict compliance in the execution of the demand, the appraisal statute ensures the expedient and certain appraisal of stock."); Nelson v. FrankE. Best, 768 A.2d 473 (Del.Ch. 2000) (refusing to allow dissenter's rights where the deadline for making a demand fell on a Sunday, and the demand was not made until the following Monday).
The Court is in agreement with these two decisions insofar as they require strict compliance with the timelines for making the written demand required by subsection (a) of Rhode Island's statute. However, the rationale for requiring strict compliance in making a demand is inapplicable to the rationale for the notation requirement — especially since the latter provision specifically allows for the exercise of judicial discretion to excusing non-compliance with the deadline.See 15 Fletcher, Corporations § 7165.30 at 437-39 (distinguishing between provisions which provide for such discretion, and statutes which do not). *Page 18 
Therefore, all that remains for this Court is to apply the standard articulated above to the facts of this case. The Court begins by examining evidence that the Defendants have suffered prejudice as a result of the arguably insubstantial delays in receiving Plaintiffs' stock certificates. It is worth noting that the type of prejudice contemplated by the statute — transfer of share certificates to unwitting third parties — certainly has not occurred for Plaintiffs Russo, Perotta, and Parillo. Their certificates have already been returned, so clearly they were not transferred. Moreover, such a transfer could not possibly have occurred in this case because the shares are subject to restrictions on transfer. See Greco,417 So. 2d at 998 (finding no possible prejudice where shares were subject to restriction on transfer). The corporation must approve any transfer of shares, and that restriction is duly noted on the certificates. (Stock Certificate, Ex. AA to Pl's Reply Mem.) Therefore, no prejudice has occurred as a result of the lost shares of Plaintiff Pecunioso, either.
The Defendants assert that they "have been and continue to be prejudiced by the uncertainty, time lapse, and great expense caused by continued protracted litigation in this matter." (Piccoli Aff. ¶ 24.) In addition, this Court inquired of Defendants' counsel at oral argument whether there was any other type of prejudice that would be suffered as a result of the delay in submitting the certificates. Counsel responded that the corporation would be forced to incur the costs of hiring an appraiser,[14] as well as associated legal costs, if the Plaintiffs prevailed.
The difficulty with this argument is that, even if the Plaintiffs had met the 20 day deadline for submitting their certificates, the Defendants would still have had to incur *Page 19 
these costs (subject to this Court's discretion to shift those costs pursuant to § 7-1.2-1202(e)), because they are a necessary part of the valuation process. Therefore, the Defendants should have expected to incur these costs from the outset, and their position has not changed as a result of the delay in submitting the share certificates.[15] Any expense to be incurred is a result of the provisions of the statute, not the Plaintiffs' delay. Moreover, based on the trail of correspondence between the parties, it is clear that the Defendants were always on notice that the Plaintiffs intended to pursue their dissent.
The Court further notes that RISAT's invocation of the termination language was not related to the underlying purpose of the notation requirement; rather, it is clear that the termination provision was used merely as bargaining leverage to force the shareholders either to accept RISAT's previously offered price, or shares in DHG under the merger.See Termination Letter, Ex. H to Pl's Mot. Summ. J. (purporting to terminate the rights to dissent, but reiterating RISAT's previous offer to purchase at the value stated in previous correspondence). However, the purpose of the notation requirement is not to allow opportunistic corporations to deprive shareholders of their right to a determination of fair value, nor to coerce shareholders into accepting a lesser price, even when such shareholders are less than diligent in submitting their certificates for notation.
As to the length of the delays, the Court notes that the notation period expired on January 8, 2007 — 20 days from the Plaintiffs' written demand. Plaintiffs Russo and Perotta returned their certificates on or about January 22, 2007 — a fourteen-day delay. (Piccoli Aff. ¶ 22.) Plaintiff Parillo returned his certificate(s) on January 26, 2007 — an *Page 20 
eighteen-day delay. Id. The Defendants received notice of Plaintiff Pecunioso's lost certificates on February 2, 2007 — a 25-day delay.Id. ¶ 23. On February 2, 2007, the Plaintiffs requested that the corporation institute a valuation proceeding, (Ex. J. to Pl's Mot. Summ. J.), within the 60 day deadline for doing so. See § 7-1.2-1202(e) (referring to a "written request for the filing [of a petition for valuation] from any dissenting shareholder given within sixty (60) days after the date on which the corporate action was effected"). In light of the fact that the Plaintiffs time for requesting a valuation proceeding had not yet expired when they tendered their certificates (or provided notice of the lost certificates), the Court is compelled to find that their delays were insubstantial in this case, because those delays did not extend the length of the procedures contemplated by the Dissenter's Rights Statute.
Therefore, the Court finds no genuine dispute that the Defendants have not been prejudiced as a result of the insubstantial delays with respect to Plaintiffs' stock certificates. The Court wishes to emphasize, however, that it would reach a different conclusion in the case of a recalcitrant shareholder who continually refuses to tender his shares even as he or she pursues a remedy under the Dissenter's Rights Statute, and especially if that shareholder has received ample notice from the corporation of the provisions of § 7-1.2-1202(h). SeePritchard, 455 N.W.2d at 267 (shareholder brought valuation proceeding but, even on the date his notice of appeal was filed, had still failed to tender certificates); In Re Glosser Bros. 555 A.2d at 143-44
(shareholder never tendered certificates). *Page 21 
 IV Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court will grant the Plaintiffs' motion for summary judgment on Count One of their complaint.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Although the Defendants have not formally brought a separate motion for summary judgment, they argued in their memorandum that they are entitled to summary judgment on Count One and all of Plaintiffs' claims for relief. Because the facts are essentially undisputed, the Court will proceed as if both parties have moved for summary judgment.See Thomas v. Ross, 477 A.2d 950, 953 (R.I. 1984) (finding it is proper to grant summary judgment in favor of a non-moving party, even in the absence of a cross-motion for summary judgment, if the requirements for summary judgment are otherwise met).
[2] DHG is headquartered in Rhode Island.
[3] Prior to the merger, members of the Piccoli family collectively owned approximately 80% of the stock in DHG, and approximately 73% of the stock in RISAT. (Executive Summary 5-7.)
[4] This notice fulfilled the requirement of the Dissenter's Rights Statute that the Plaintiffs
 "file with the corporation, prior to or at the meeting of shareholders at which the proposed corporate action is submitted to a vote, a written objection to the proposed corporate action." Section 7-1.2-1202(a).
[5] The demand requirement of the Dissenter's Rights Statute states that
 "[i]f the proposed corporate action is approved by the required vote and the shareholder has not voted in favor of it, the shareholder may, within ten (10) days after the date on which the vote was taken. . . make written demand on the corporation, or, in the case of a merger, on the surviving or new corporation, domestic or foreign, for payment of the fair value of the shareholder's shares." Section 7-1.2-1202(a).
The language used in counsel's letter does not use the word "demand" and it is not entirely clear that the letter would constitute a demand under the terms of the Dissenter's Rights Statute. The Defendants, however, have stipulated that they understood the intent of the letter to be a demand within the meaning of the statute. Therefore, the Court will treat this letter as complying with the demand requirement. (Piccoli Aff. ¶ 16.)
[6] During roughly the same time period, DHG also engaged in a similar merger with Centers for Behavioral Health-PA, Inc., a Pennsylvania corporation. (Piccoli Aff. ¶ 7.)
[7] For every one share of RISAT stock, the shareholders of RISAT would receive 0.1233 shares of DHG stock. (Executive Summary 6.)
[8] RISAT offered to pay $97,186 to Plaintiff Michael Russo; $174,935 to Walter Parillo; $77,749 to Louis Perotta; and $77,749 to Gloria Pecunioso. (Ex. D. to Def's Mem. Opp. to Summ. J.)
[9] For example, the Plaintiffs object to the use of discounts for lack of control and lack of marketability in valuing the shares of RISAT. See Fair Market Value Opinion 44-50, Ex. N to Pl's Mot. Summ. J. (applying a 10% discount for lack of control and a 15% discount for lack of marketability). The use of such discounts for valuation purposes is clearly prohibited by Rhode Island law in the context of a shareholder whose shares are purchased in order to avoid dissolution proceedings.Charland v. Country View Golf Club, 588 A.2d 609, 613 (R.I. 1991);see generally Christopher Vaeth, Propriety of Applying Minority Discountto Value of Shares Purchased by Corporation or its Shareholders fromMinority Shareholders, 13 A.L.R.5th 840 (1993) (collecting cases in both dissent and dissolution contexts). Plaintiffs contend that such discounts are similarly prohibited in the context of a shareholder who dissents from a corporate merger. See Charland, 588 A.2d at 611
n. 5.
[10] In this case, the shares were subject to restrictions on transfer. The corporation must approve any transfer of shares, and that restriction is duly noted on the certificates. (Stock Certificate, Ex. AA to Pl's Reply Mem.) Therefore, it is unlikely that any prejudice would befall a third party in this case. However, such restrictions will not exist in all cases. Therefore, the Court finds that the statutory reference to a "certificate or certificates representing his shares" refers to all certificates representing shares in the pre-merger corporation, regardless of whether those shares were capable of transfer to an unwitting third party.
[11] The rationale for construing such statutes in favor of a shareholder is even more compelling in the case of a close corporation, where there is no ready market for liquidating one's shares. 15 William Meade Fletcher et. al., Cyclopedia of the Law of PrivateCorporations § 7165.30 at 441 (perm. ed., rev. vol. 1999) (hereinafter "Fletcher, Corporations") (noting that, where courts have discretion to ignore time requirements, they will consider prejudice to the corporation as well as the effect on the shareholder, so that a liberal construction is more likely in the case of a close corporation).
[12] The time period is 10 days for corporate actions which require a vote. If an action does not require a vote, then a shareholder can exercise its rights simply by making demand within 15 days of the date that notice of the action is mailed to the shareholders. Section7-1.2-1202(a).
[13] The Defendants also rely upon Application of Wiedersum.246 N.Y.S.2d 638, 639 (N.Y. Misc. 1964). However, in that case, not only did the Plaintiff wait over six months to submit his shares for notation, but he also failed to timely bring an action for valuation of the shares. Id. Therefore, he also violated the statutory requirement to file a valuation action "on the fifteenth day after the last day on which the demand of the objecting stockholder for payment might have been made." Id. Unlike the requirement for submitting certificates, this latter requirement was not subject to an exception "for good and sufficient cause shown."
[14] It is not clear to the Court why the Defendants cannot rely upon the appraisal that was performed prior to the Merger, although the Court recognizes that some additional expense may be incurred if that appraiser is required to testify in a valuation proceeding.
[15] To the extent that the "good and substantial cause" issue has delayed the valuation proceeding and caused additional expense, such delay could have been avoided if the Defendants had chosen not to press the issue. Such prejudice is simply the price of any strategic decision made in litigation.