Clarence LAPRE et al.

v.

Wendall J. FLANDERS et al.

No. 81–55–Appeal.

Supreme Court of Rhode Island.

Sept. 7, 1983.

F. Monroe Allen, Providence, for plaintiffs.

Stephen F. Mullen, Providence, for Dept. of Transp.

Stephen A. Fanning, Jr., Edwards & Angell, William F. McMahon, McMahon & McMahon, Providence, for Second Pawt. Area Indus. Foundation.

George M. Vetter, Jr., John A. MacFadyen 3rd, Vetter & White, Providence, Ronald R. Gagnon, Blais, Cunningham, Thayer, Gagnon & Ross, Pawtucket, for Textron.

OPINION

**SHEA, Justice.**

This is an action for equitable relief and compensatory damages brought by the plaintiffs, Clarence and Sylvania Lapre (the Lapres). Their land was condemned by the state in 1946 for construction of the North Central Airport in Smithfield, Rhode Island. When a portion of this land taken was determined to be no longer necessary for airport purposes, it was sold with certain restrictions on its use to defendant Second Pawtucket Area Industrial Development Foundation, Inc. (Second Pawtucket).[1] The latter subsequently conveyed the property to defendant Textron, Inc. (Textron).

The Lapres assert that they had a constitutional right under article XVII of the amendments to the Rhode Island Constitution to repurchase the land once the state determined that it was no longer needed for airport purposes. Since they were at no time offered an opportunity to repurchase their land, they demanded that the deeds executed by the state be declared null and void, that title be revested in them, and that they be awarded $500,000 in damages.

After trial, a Superior Court justice rendered a decision in which he agreed that the Lapres had a constitutional right to repurchase, but he found that they had conveyed that right to the state, for consideration, when they executed releases and quit-claim deeds in 1950 conveying all their right, title, and interest to the state. Judgment was entered accordingly for defendants and the Lapres appealed. We agree with the trial justice's finding that the Lapres' execution of the releases and quit-claim deeds extinguished any rights plaintiffs had in this property. Therefore, we affirm the judgment entered below. However, we disagree with his conclusion that the Lapres had a constitutional right to repurchase under article XVII.

---

1. The land was conveyed to Second Pawtucket in two installments, one on December 26, 1962, and the other on December 8, 1975.

In pertinent part, article XVII reads as follows:

"§ 1. Acquisition of excess land by public agencies.—The general assembly may authorize the acquiring or taking in fee by the state, or by any cities or towns, or more land and property than is needed for actual construction in the establishing, laying out, widening, extending or relocating of public highways, streets, places, parks or parkways * * *. After so much of the land and property has been appropriated for such public highway, street, place, park or parkway as is needed therefor, the remainder may be held and improved for any public purpose or purposes, or may be sold or leased for value with or without suitable restrictions, and in case of any such sale or lease, the person or persons from whom such remainder was taken shall have the first right to purchase or lease the same upon such terms as the state or city or town is willing to sell or lease the same."

Asserting that an airport is a public place, the Lapres contend that the trial justice was correct in holding that this provision applied to land condemned for airport purposes.[2]

■ After a careful examination of the text of the amendment and its background, it is our opinion that the Lapres and the trial justice have mistakenly relied on the reference to public "place" in article XVII. We have had occasion to construe the language of this amendment in *Griffin v. Bendick*, R.I., 430 A.2d 1340 (1983), where the plaintiff argued the amendment's applicability to land taken for a state port. We examined article XVII's text as well as its history and concluded that the word "place," read in the context of the clause in which it appears, "refers to a court or square or short street." Our holding on the meaning of this language of the amendment in *Griffin* is controlling here; therefore, an extended discussion of this issue is unnecessary.

We do note that article XVII of the amendment was first proposed by the Legislature on May 1, 1914 (Resolution No. 1), a scant eleven years after the Wright Brothers' first flight at Kitty Hawk. At this time, the motorcar, but not the airplane, had begun to make changes in the American landscape. When the amendment is examined in its historical context, it seems highly unlikely that the Legislature ever contemplated airports to fall within its purview.

■ Although the Lapres did not have a preemptive constitutional right to repurchase their former lands, they arguably had a statutory right to repurchase under G.L. 1938, ch. 110, § 15, the statute in effect at the time the property was condemned. That statute was later incorporated into G.L.1956 (1977 Reenactment) § 37–7–3, which was in effect at the time the land was conveyed to Second Pawtucket.

It is equally apparent that the Lapres had conveyed away the totality of their rights in the condemned land when they executed quit-claim deeds and releases to the state. The deeds conveyed all of the Lapres' "right, title and interest" to the properties, and they contained no express limitations on the estates conveyed. As our statutes indicate, absent specific mention of an excepted or reserved right or interest, the conveyance passes all rights, including future interests appertaining to the land. General Laws 1956 (1969 Reenactment) §§ 34–11–4, 34–11–17, 34–11–18, 34–11–28, and 34–4–11.[3]

---

2. The Lapres also argue that this court is precluded from reviewing this constitutional issue because it was unappealed by defendants. However, the question of whether defendants themselves are entitled to challenge the trial justice's findings appears immaterial since it is this court that is vested with the ultimate responsibility for resolving questions of constitutional applicability. "[T]his court exercises its independent judgment in determining whether constitutional rights have been appropriately applied * * *." *State v. Cline*, R.I., 405 A.2d 1192, 1196 (1979).

3. We note that the law at the time of these conveyances can be found at G.L.1938, ch. 435, § 10; ch. 436, §§ 4, 9, and 7; and ch. 433, § 10. However, the provisions of the statutes have

By the clear and unambiguous language of the releases, the Lapres forfeited "forever" all "manner of actions, cause of actions, debts due, claims and demands" against the state arising from the taking of their land and "any and all damage" related to the taking. We have stated that only under limited specified conditions such as fraud, misrepresentation, or mutual mistake will a release, valid on its face, be set aside. *See Griffin v. Bendick,* 463 A.2d 1340 (R.I., 1983).

We see no reason to depart from this rule in the case before us. There is no evidence that the release was obtained by fraud, misrepresentation, or mutual mistake. The Lapres were represented by counsel throughout the condemnation proceedings. Mrs. Lapre herself conceded she knew she was giving up all rights in the farm when she executed these instruments.

■ Finally, there was adequate consideration to support these instruments. Under G.L.1938, ch. 110, § 5 (the statute in effect when the Lapres' land was condemned in 1946), in land-condemnation proceedings for airport purposes, title to the state passed immediately upon the filing of a plat and a condemnation statement in the land-records office of the city or town in which the land was situated. No deed or release of any kind was necessary to complete the condemnation. Here, however, the testimony of Isadore D'Orsi, the chief of property acquisition for the Department of Transportation, indicates that the state wanted "[t]o acquire absolute right into the property to be acquired, including the right of redemption." Additional sums and concessions were therefore offered, after several years of negotiations, to the plaintiffs for the execution of quit-claim deeds relinquishing any future right to repurchase that might arise. There can be little dispute concerning the adequacy of the consideration, for as a result of these negotiations, the Lapres received more for their property than was initially offered by the state. Taxes on the land were paid on their behalf to the town of Smithfield. A right of way across airport land was granted to Clarence. Consequently, there is no reason for setting aside these conveyances.

Accordingly, for the foregoing reasons, the plaintiffs' appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of this case are remanded to the Superior Court.

## APPENDIX

General Laws 1956 (1969 Reenactment):

"34–11–4. Delivery of conveyance sufficient to pass title.—Any form of conveyance in writing, duly signed and delivered by the grantor, or the attorney of the grantor duly authorized, shall be operative to convey to the grantee all the possession, estate, title and interest, claim, demand or right of entry or action, of the grantor, absolutely in and to the land conveyed, unless otherwise expressly limited in estate, condition, use or trust, and if otherwise expressly limited, shall convey such property for the time or estate or on the condition, use or trust as declared, without any other act or ceremony; and if also duly acknowledged and recorded, shall be operative as against third parties."

"34–11–17. Effect of quitclaim deed.—A deed substantially following the form entitled 'Quitclaim Deed' shall, when duly executed, have the force and effect of a deed in fee simple to the grantee and his heirs and assigns, to his and their own use, with covenants on the part of the grantor, for himself and for his heirs, executors, and administrators, with the grantee and his heirs and assigns, that he will, and his heirs, executors, and administrators shall, warrant and defend the granted premises to the grantee and his heirs and assigns forever against the lawful claims and demands of all persons claiming by, through, or under the grantor."

"34–11–18. Meaning of quitclaim covenants.—In any conveyance of real estate

remained unchanged to the present day. For text of these statutes, see Appendix.

the words 'with quitclaim covenants' shall have the full force, meaning, and effect of the following words: 'The grantor, for himself and for his heirs, executors and administrators, covenants with the grantee and his heirs and assigns, that he will, and his heirs, executors and administrators shall, warrant and defend the granted premises to the grantee and his heirs and assigns forever against the lawful claims and demands of all persons claiming by, through, or under the grantor.' "

"34–11–28. Rights, privileges, and appurtenances included in grant.—In any conveyance of real estate all rights, privileges and appurtenances belonging or appertaining to the granted estate shall be included in the conveyance, unless a different intention shall clearly appear in the deed, and it shall be unnecessary to enumerate or mention them either generally or specifically."

"34–4–11. Conveyance of contingent, executory, and future interests.—Hereafter a contingent, an executory and a future interest, and a possibility coupled with an interest, in any tenements or hereditaments of any tenure, also a right of entry, whether immediate or future and whether vested or contingent, into or upon any tenements or hereditaments of any tenure, may be disposed of by legal conveyance or will; but no such disposition shall, by force only of this section, defeat or enlarge an estate tail."