46 A.3d 39 (2012)
Charles TAKIAN et al.
v.
Ralph RAFAELIAN et al.
v.
Charles Takian et al.
No. 2010-372-Appeal.
Supreme Court of Rhode Island.
June 29, 2012.
*42 Patrick J. Dougherty, Esq., for Plaintiffs.
Paul R. Crowell, Esq., Providence, for Defendants.
Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON JJ.

OPINION
Justice FLAHERTY, for the Court.
"In the business world, the rearview mirror is always clearer than the windshield."[1] This dispute springs from the remnants of a potentially fruitful business relationship that rapidly turned sour. The plaintiffs, Charles and Marguerite Takian, and the defendants, Ralph and Lucia Rafaelian, together purchased property in South Kingstown that included a motel, a restaurant, and a trailer park.[2] The couples formed Lumar Realty Corporation to manage the property, and the plaintiffs agreed to run the businesses situated on it. In 2002, the relationship between the plaintiffs and the defendants began to deteriorate because the defendants believed that the plaintiffs were mismanaging the businesses, and the defendants decided to sell their interest to the plaintiff's son, Randolph. As part of the sale, the defendants signed a release absolving the plaintiffs from "any and all claims arising out of the ownership of the property and operation of the business."
After the sale, defendants continued to feel unsettled about how the business had been operated. They investigated further and alleged to have discovered facts that *43 suggested far more serious misdeeds in the management of Lumar. It was plaintiffs, however, that initiated legal action. They filed an action for declaratory relief, in which they sought a ruling that the release that had been executed by defendants contemporaneous with the sale barred any further claims. The defendants counterclaimed, both on behalf of themselves and derivatively on behalf of the corporation, alleging a torrent of claims, including embezzlement, misrepresentation, misappropriation, and loss of corporate opportunity. A justice of the Superior Court granted summary judgment in favor of plaintiffs, after he found that the release was both valid and effective against both defendants and the corporation. This appeal ensued.
On March 6, 2012, the parties appeared before this Court for oral argument based on an order directing the parties to show cause why the issues raised by defendants' appeal should not be decided summarily, without further briefing or argument. After considering the record, the memoranda submitted by the parties, and the oral arguments advanced by each, we are of the opinion that cause has not been shown and that the appeal should be decided at this time. For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court, and remand the matter for further proceedings not inconsistent with this opinion.

I

Facts & Travel
In 1986, plaintiffs and defendants purchased property located at 836 Matunuck Road in South Kingstown, Rhode Island; there were three businesses on the property: the Blackbeard Ocean View Hotel, a small restaurant, and a trailer park. Each couple contributed a $25,000 downpayment to the purchase price and each owned a 50 percent interest in the property.[3] According to defendants, there was a quid pro quo agreement between the parties; defendants would finance the remainder of the purchase price if plaintiffs would operate the business. To effectuate their intent, the parties formed Lumar Realty Corporation. The corporation's stated purpose was to manage the hotel and real estate operations, which included the sale and rental of space for trailers and the maintenance of the property. Significantly, no stock was issued by the corporation at the time of its formation.
Despite the existence and stated purpose of Lumar, it is unclear from the record whether the corporation was continuously used to manage the businesses. For instance, letters to the trailer park tenants from the early 1990s ask the tenants to make their rent checks payable to Lumar Realty Corp., but subsequent letters from the mid-to-late 1990s ask the tenants to make their checks payable to Charles Takian. Lumar entered into lease agreements with trailer-park tenants as lessor, but at no time did the corporation own any of the property. In 2000, Lumar's corporate charter was revoked for failure to file an annual report with the secretary of state, but defendants had the charter reinstated in 2003. Additionally, it is undisputed that although the corporate charter authorizes the issuance of 600 shares of stock, Lumar did not issue any stock until 2005, when defendants issued fifty shares each to themselves.
The defendants contend that a series of revelations about the corporation's businesses *44 led to the deterioration and eventual dissolution of their relationship with plaintiffs. First and foremost, the businesses did not appear to be profitable or even capable of meeting their operating costs. The defendants assert that they received a notice from the fire district that the property was subject to a tax sale because of unpaid taxes. A liability insurance cancellation notice was also issued. Furthermore, when defendants visited the property, they found it to be in "deplorable condition." Thus, defendants decided to bring their involvement in this venture to an end by selling their interest to plaintiffs.
The defendants hired an accountant, Mark Provost, C.P.A., to review Lumar's records in preparation for the sale. The records showed that "shareholders" had loaned Lumar $145,673, which had been placed into a "loan account." Based on his review, however, Provost concluded that $94,961 had been withdrawn from that account over time. The defendants alleged that these withdrawals represented "actual distributions" of money and that because they received no money, plaintiffs must have improperly kept the proceeds entirely for themselves. Conversely, an accountant retained by plaintiffs to inspect the corporation's finances testified at a deposition that the loan account was used when he compiled Lumar's annual tax returns as a "balancing account" to balance the corporate check book at the end of the year. He illustrated this purpose using the following example: If the checking account had a balance of $5,000 at the beginning of the year, and the corporation had a net profit of $10,000, but at the end of the year the account's balance was only $8,000, then he would debit the shareholder loan account $7,000 to balance the checking account. The defendants argued that this was merely an artifice to cover up the plaintiffs distributions of corporate funds to themselves.
Upset by these revelations, Ralph Rafaelian authored a memorandum, which he sent to plaintiffs, that summarized his understanding of the loan account, the distributions from that account he believed he and his wife were entitled to, and additional compensation he believed they were owed because of plaintiffs' general mismanagement of the property over the years. After detailing the basis for defendants' grievances against Charles and Marguerite Takian, the memorandum concluded with an ultimatum; in addition to a purchase price, it demanded a separate $100,000 payment to them from Charles and Marguerite. Concluding, Ralph threatened that if plaintiffs did not agree to such a payment, "the deal is terminated" and defendants will conduct "a full audit and let the `chips fall.'"
The plaintiffs agreed immediately to the $100,000 payment, and they delivered a promissory note through Randolph to defendants. The plaintiffs' riposte came in the form of a "joint and mutual release and indemnity agreement." The agreement says, in relevant part, "The Takians and Rafaelians hereby mutually release one another from any and all claims arising out of the ownership of the property and operation of the business." Additionally, plaintiffs agreed to "defend, indemnify, and hold harmless the Rafaelians from any and all liability arising out of the parties ownership of the property and operation of the business * * *." All the parties, including Randolph, signed the agreement and the sale was consummated in August 2002. At all times during the closing, the Rafaelians were represented by counsel.
In 2003, plaintiffs sold the campground to the Blackbeard Housing Association, an organization that had been created by the property's tenants, for $1.4 million. It is *45 noteworthy that in July 2002, a tenant named Donald Tatro had approached Lucy Rafaelian and told her that the tenants were interested in purchasing the property; she responded by telling them to come back with an offer of more than $1 million. The defendants say that Charles Takian became aware of the offer and threatened the tenant spearheading the effort to buy the property by "screaming and hollering" that he would handle any negotiations and that "in no uncertain terms" he was not to speak to Lucy. Lucy received no further calls from the association before defendants' sale of their interest to Randolph Takian.
Even after severing their ties to the property and ending their business relationship with plaintiffs, defendants continued to investigate plaintiffs' management of Lumar. Eventually, they came to believe that plaintiffs were guilty of more nefarious wrongdoings than they originally had suspected. Both plaintiffs and defendants filed miscellaneous petitions for discovery in the Superior Court, in which they sought each other's financial records. After it came to light that the trailer-park tenants' checks had been deposited into plaintiffs' personal bank account, plaintiffs, in a preemptory strike, sought a declaratory judgment that the release-and-indemnity agreement executed in connection with the sale was valid and that it barred any further claims by defendants. In response, defendants filed a plethora of counterclaims.[4]
The plaintiffs filed a motion for summary judgment, and a hearing was held before a justice of the Superior Court on June 14, 2010. After considering the arguments of the parties, the motion justice found that the release was valid and that it barred both the personal claims of defendants and their derivative claims on behalf of Lumar. In reaching this conclusion, the motion justice found that the prima facie requirements for a valid release were present: plaintiffs provided consideration for the release, and each of the parties was represented by counsel. With respect to defendants' direct claims, he found that defendants were "experienced business owners" who owned a jewelry company and that they were "not novices in matters of business." In ruling that the release should not be set aside based on fraud or misrepresentation, the motion justice found that when defendants signed the release, they had at least some knowledge not only of plaintiffs mismanagement of the business, but also of more serious illegal conduct. He declared that "a person is not deceived who knows himself to be deceived," and he based that conclusion largely on the ultimatum contained in defendants' memorandum to plaintiffs, which alluded to conducting a full audit. He found that the ultimatum made clear that plaintiffs could have pursued the matter further, but were choosing instead to *46 "make peace" and be done with the matter.
With respect to defendants' derivative claim, the motion justice ruled that the release was equally operative against Lumar. First, he found that defendants' counterclaim on behalf of Lumar did not comport with the requirements of Rule 23.1 of the Superior Court Rules of Civil Procedure because defendants were not shareholders at the time of the alleged improprieties. Additionally, he noted that Lumar's charter had been revoked in 2000 and was not reinstated until 2003. He also found it significant that "all the officers, directors, [and] shareholders participated, made peace, settled, and released each other from all claims." He concluded that defendants' argument was therefore "hyper-technical" and did not "do justice to the circumstances." Accordingly, he found that defendants could not maintain any of their derivative claims, and he granted summary judgment in favor of plaintiffs.[5]
Lastly, the motion justice concluded that defendants also had presented no evidence to support their claims against Randolph Takian. He found that defendants could point to nothing in the record showing that they reasonably relied on any representations made by Randolph. Conversely, he found that Ralph Rafaelian admitted in his deposition testimony that he did not rely on Randolph at all and had no relationship with him. Therefore, he found in favor of plaintiff on those claims.

II

Standard of Review
"It is a fundamental principle that `[s]ummary judgment is a drastic remedy, and a motion for summary judgment should be dealt with cautiously.'" Employers Mutual Casualty Co. v. Arbella Protection Insurance Co., 24 A.3d 544, 553 (R.I.2011) (quoting Estate of Giuliano v. Giuliano, 949 A.2d 386, 390 (R.I.2008)); McPhillips v. Zayre Corp., 582 A.2d 747, 749 (R.I.1990) (citing Commercial Union Companies v. Graham, 495 A.2d 243 (R.I. 1985); Rustigian v. Celona, 478 A.2d 187 (R.I.1984); Steinberg v. State, 427 A.2d 338 (R.I.1981)). This Court "review[s] the granting of a motion for summary judgment de novo." Zanni v. Voccola, 13 A.3d 1068, 1070 (R.I.2011). In so doing, we follow the same standards and criteria as the trial justice. Id. This Court will affirm a trial justice's ruling that grants a party summary judgment "if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Classic Entertainment & Sports, Inc. v. Pemberton, 988 A.2d 847, 849 (R.I. 2010) (quoting Lynch v. Spirit Rent-A-Car, Inc., 965 A.2d 417, 424 (R.I.2009)). "This Court reviews the evidence and draws `all reasonable inferences in the light most favorable to the nonmoving party.'" Id. (quoting Fiorenzano v. Lima, 982 A.2d 585, 589 (R.I.2009)). "The nonmoving party bears the burden of showing the existence of disputed issues of material fact by competent evidence; it `cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.'" Zanni, 13 A.3d at 1071 (quoting Classic Entertainment & Sports, Inc., 988 A.2d at 849).

III

Arguments of the Parties
On appeal, defendants argue that the motion justice erred when he granted summary *47 judgment on their direct claims because he made impermissible findings with respect to issues that the parties genuinely disputed. The defendants assert that the motion justice improperly found as a fact that defendants (1) knew about the scope and extent of plaintiffs' misconduct, (2) knew that the Blackbeard Housing Association was willing and able to negotiate about the sale of the property, and (3) that defendants were "sophisticated" businesspeople. The defendants also argue that the motion justice erred as a matter of law with respect to disclosure requirements attendant to plaintiffs' fiduciary duty to defendants. As for their derivative claims, defendants argue that the motion justice erred because he improperly "construed facts and circumstances" when he held that the release applied to Lumar despite the fact that the corporation is not even referred to in the agreement. Additionally, defendants contend that the motion justice erred when he concluded that the reinstatement of a revoked certificate of incorporation does not have the retrospective effect of granting standing to the corporation to sue for wrongs committed during the period of revocation.
The plaintiffs, on the other hand, argue that the motion justice correctly concluded that the required elements for a release of claims were present. Therefore, they assert, the release was effective to bar all of defendants' direct counterclaims. With respect to the derivative claims, plaintiffs argue that defendants have no standing to bring counterclaims on behalf of Lumar because they were not stockholders at the time of the alleged wrongdoing.

IV

Analysis

A. Appellants' Derivative Claim
The motion justice granted summary judgment in favor of plaintiffs on the claims that defendants brought on behalf of Lumar, reasoning that they had not complied with the requirements of Rule 23.1 because they were not shareholders at the time of plaintiffs' alleged misdeeds. Additionally, the motion justice expressed concern about the fact that the secretary of state had revoked Lumar's corporate charter in 2000, that the charter was not reinstated until after the sale, and that the reinstatement was achieved unilaterally by defendants. Moreover, he found it unsettling that a right of action could survive in Lumar, which was a closely held corporation, when all the parties with an interest in the corporation had agreed to the release. After considering the relevant law and the arguments of the parties, we affirm the ruling of the motion justice.
Rule 23.1 provides that, in a derivative action by a shareholder, the verified complaint "shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law." The Rhode Island provision is similar to the federal rule, and this Court frequently turns to federal case law for guidance in its interpretation of similar rules of procedure. See Greensleeves, Inc. v. Smiley, 942 A.2d 284, 290 (R.I.2007). The primary purpose of the so-called contemporaneous shareholder rule is to "prevent[] * * * courts from being used to litigate purchased grievances." 7C Charles Alan Wright et al., Federal Practice and Procedure § 1828, at 66, 67 (2d ed.1986). In other words, this rule reflects a desire to curb the opportunism of individuals who might purchase shares simply for the purpose of bringing a derivative suit, thereby obtaining *48 a windfall if the corporation recovers.[6]See Franklin A. Gevurtz, Corporation Law § 4.3.2 (2d ed.2010). Under federal law, the derivative action complainant must generally have acquired his stock before the wrongful conduct occurred. See, e.g., In re: Bank of New York Derivative Litigation, 320 F.3d 291, 297 (2d Cir.2003).[7]
In this case, it is undisputed that Lumar Realty issued no stock until 2005, when defendants issued shares to themselves. Therefore, defendants were not shareholders at the time that the alleged wrongs took place, and, consequently, they have no standing to bring a shareholder derivative action under Rule 23.1. Therefore, we affirm the trial justice's granting of summary judgment in favor of the plaintiffs on count 1 of defendants' counterclaims.

B. Appellants' Direct Claims

1. Counterclaims Against Randolph Takian
In their multicount counterclaim, defendants make a number of allegations against plaintiff Randolph Takian, some of which are also levied against his parents: negligent misrepresentation; fraudulent inducement; breach of the duty of good faith and fair dealing; loss of business opportunity; fraudulent inducement to sell an interest in real estate; violation of the Rhode Island RICO Act; and conspiracy to violate the RICO Act. The defendants base these claims primarily on Randolph's involvement in the sale of the property, during which he acted not only as an interested party in his own right, but also as the messenger between the Rafaelians and his parents. In brief, they assert that Randolph failed to exercise reasonable care with respect to the information he conveyed about the sale, and that his representations were an attempt to further hinder or confuse the Rafaelians with respect to their investigation of his parents' management of Lumar. In his ruling, the motion justice considered the claims against Randolph Takian separately from those lodged against his parents, and found that "the Rafaelians have pointed to nothing in the memoranda or in argument before this Court in the way of specific representations or concealed facts by Randolph Takian upon which they conceivably relied upon to their detriment in settling their dispute with the Takians." To the contrary, the motion justice found most persuasive an express statement by Ralph Rafaelian in his deposition testimony that he did not rely on Randolph Takian in any way, and that he had no relationship with him.
We agree with the ruling of the motion justice. First, defendants did not demonstrate that they reasonably relied, to their detriment, on representations made by Randolph. See Manchester v. Pereira, 926 A.2d 1005, 1012 (R.I.2007) (discussing elements of negligent misrepresentation); Women's Development Corp. *49 v. City of Central Falls, 764 A.2d 151, 161 (R.I.2001) (discussing elements of fraudulent inducement). The supporting material defendants submitted in opposition to plaintiff's motion for summary judgment detail how Charles and Marguerite Takian relied extensively on Randolph for advice and "legwork" related to the property. However, other than the fact the he served as a conduit for most of the communication between his parents and defendants, defendants point to no specific representations made by Randolph that resulted in any injury to them. In our opinion, defendants' assertion that Randolph colluded with his parents to defraud them is speculative and unsupported by the evidence presented to the motion justice.
We reach a similar conclusion with respect to the claim against Randolph for loss of corporate opportunity. "Corporate officers and directors of any corporate enterprise, public or close, have long been recognized as corporate fiduciaries owing a duty of loyalty to the corporation and its shareholders and [are] thereby prohibited from diverting corporate opportunities to themselves." A. Teixeira & Co. v. Teixeira, 699 A.2d 1383, 1386 (R.I.1997). "To successfully state a claim [for loss of corporate opportunity] a plaintiff must demonstrate that the defendant was a corporate fiduciary and that he or she diverted a corporate opportunity." Id. Randolph was not an officer, director, or other corporate fiduciary of the Lumar Corporation. Moreover, defendants' evidence with respect to Randolph's alleged collusion to sell the property to the Blackbeard Homeowners' Association  despite the extensive discovery in the case  was wholly speculative. In addition, because the loss of opportunity is a wrong against the corporation, the vast majority of courts analyzing such claims have concluded that the appropriate remedy is an action either by the corporation itself or by shareholders in a derivative suit. See, e.g., Perlman v. Feldmann, 219 F.2d 173 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); In re Big Wheel Holding Co., 214 B.R. 945, 951-52 (D.Del.1997); Energy Resources Corp. v. Porter, 14 Mass.App.Ct. 296, 438 N.E.2d 391 (1982). As discussed above, the Rafaelians lacked standing to sustain any derivative claims on behalf of Lumar. Therefore, we affirm that portion of the motion justice's ruling that granted summary judgment to plaintiffs on count 7 of defendants' counterclaim with respect not only to Randolph, but also in favor of Charles and Marguerite Takian.
Count 6 of defendant's counterclaim against Randolph for breach of the duty of good faith and fair dealing also must fail. "[I]t is well settled that there is an `implied covenant of good faith and fair dealing between parties * * * so that the contractual objectives may be achieved.'" Now Courier, LLC v. Better Carrier Corp., 965 A.2d 429, 435 (R.I.2009) (quoting Ide Farm & Stable, Inc. v. Cardi, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972)). However, this Court has also held that "this requirement only applies after a binding contract is formed." Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I.1996). Here, defendants have failed to allege facts suggesting that Randolph acted in "bad faith" in carrying out the terms of the release; on the contrary, they are asking that the release be set aside.
Count 9 of defendants' counterclaim alleges abuse of process against "Takian Counterclaim Defendants." We have scoured the record and are unable to find any definitive analysis from the trial justice on this issue.[8] Because this allegation *50 necessarily arose separate and apart from the facts that underlie the other counts in this dispute, we are thus left without a sufficient record to review this claim, and we remand the matter to the Superior Court for a ruling on defendants' abuse-of-process counterclaim against Charles, Marguerite and Randolph Takian.

2. The Remaining Counterclaims Against Charles and Marguerite Takian (Counts 2, 3, 4, 5, 6, 9, 10 and 11)
A release is a contractual agreement governed by the principles of contract law. See Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 558 (R.I.2009). As this Court held in Guglielmi v. Rhode Island Hospital Trust Financial Corp., 573 A.2d 687, 689 (R.I. 1990):
"The law concerning this issue is well settled in this jurisdiction. The validity of a release must be determined in light of three factors: (1) the existence of consideration for the release, (2) the experience of the person executing the release, and (3) the question of whether the person executing the release was represented by counsel. Finding satisfactory answers to these questions, the court will find a release to be valid and binding unless it has been procured through fraud, misrepresentation, overreaching, or a material mistake on the part of either party."
We agree with the motion justice's finding that the parties did not seriously dispute whether the release was proper on its face. See Guglielmi, 573 A.2d at 689. However, the motion justice also ruled that the release should not be set aside because of fraud or misrepresentation. He based that finding on his conclusion that defendants knew when they signed the document not only about plaintiffs' mismanagement and misappropriation, but also about the potential for more significant wrongdoing. His decision relied primarily on defendants' memorandum to plaintiffs containing the threat to conduct a "full audit." He found the $100,000 ultimatum was tantamount to an admission by defendants that they knew about more serious improprieties, and he concluded that they were "making peace" and willing to let sleeping dogs lie.[9]
Whether plaintiffs committed acts or omissions that would render the release voidable, however, requires the resolution of material facts that the parties genuinely, indeed vigorously, disputed. See Guglielmi, 573 A.2d at 689. The record clearly shows that defendants steadfastly and vigorously contended throughout the course of this litigation that their demand for a $100,000 payment from plaintiffs represented, in their minds, only their fair share of distributions based on what they believed had already been distributed to plaintiffs, plus additional losses attributable to plaintiffs' mismanagement, but not for any further wrongdoings. Indeed, one of defendants' contentions was that they discovered evidence of wrongful acts  such as the letters from the late 1990s directing the trailer park tenants to make their rent checks payable to Charles Takian personally  only after the Takians had presented them with the release, and after they had executed it. When the motion *51 justice decided otherwise, it is our opinion that he necessarily considered the evidentiary weight of the memorandum against the alternative evidence, and that he erred when he construed that evidence against defendants and not "in the light most favorable to the nonmoving party."[10]See Zanni, 13 A.3d at 1071; Classic Entertainment & Sports, Inc., 988 A.2d at 849. The same is true of the motion justice's findings that defendants were "sophisticated" businesspeople, and his findings on the extent to which they may have been aware of negotiations with the tenants association about the sale of the property.
Furthermore, there is, in our judgment, a triable issue of fact with respect to whether plaintiffs breached a duty of loyalty to defendants as the officers of a closely-held corporation. See Hendrick v. Hendrick, 755 A.2d 784, 789 (R.I.2000) ("We are mindful that `[c]orporate officers and directors of any corporate enterprise, public or close, have long been recognized as corporate fiduciaries owing a duty of loyalty to the corporation and its shareholders * * *.'" (quoting A. Teixeira & Co., 699 A.2d at 1386)).
"[S]ummary judgment should occasion the termination of a case only where it is absolutely clear `that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.'" Estate of Giuliano, 949 A.2d at 394. "The judge's belief that one scenario is more probable than the other is not a legally sufficient reason to grant a motion for summary judgment." McPhillips, 582 A.2d at 750. Although a motion justice entertaining such a motion may "search for the existence of factual issues," he or she "may not determine them * * * nor may the trial justice assess the weight or the credibility of the evidence." Id. at 749. Those duties fall within the province of a fact-finder. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions * * *."). Therefore, we vacate the judgment of the Superior Court on plaintiffs' motion for summary judgment with respect to counts 2, 3, 4, 5, 6, and 8 against Charles and Marguerite Takian.
Because we have concluded that the motion justice's ruling with respect to the release was error, we also must revisit counts 10 and 11 of defendants' counterclaim, which alleged a violation of the Rhode Island Racketeer Influenced and Corrupt Organizations Act and conspiracy to violate that act, respectively, against Charles, Marguerite, and Randolph Takian. Understandably, the trial justice found that defendants' RICO counterclaims were "disposed of by [his] decision upholding the validity of the release"; and he did not provide any further analysis of those claims.[11] In light of our holding that there were disputed issues of fact precluding summary judgment regarding whether the release should be set aside, and the lack of a detailed analysis from the trial judge on the validity of the RICO claims, we vacate the judgment of the Superior Court with respect to counts 10 and 11, *52 and remand the matter for a ruling on whether the court should grant summary judgment in favor of the plaintiffs on those claims.

V

Conclusion
To summarize, we hold as follows:
On counts 1 and 7, of the defendants' counterclaim, with respect to all the plaintiffs in this matter, the judgment of the Superior Court is affirmed.
On counts 3, 4, 6, and 8 of the defendants' counterclaim, with respect to Randolph Takian only, the judgment of the Superior Court is affirmed.
Counts 9, 10, and 11, which were not analyzed by the motion justice, are remanded to the Superior Court for a ruling.
On counts 2, 3, 4, 5, 6, and 8, with respect to Charles and Marguerite Takian, the judgment of the Superior Court is vacated and the matter is remanded to the Superior Court for a trial on those counts.
The papers in this case are remanded to the Superior Court.
Justice INDEGLIA did not participate.
Justice GOLDBERG, concurring in part and dissenting in part.
I write separately in this case because I respectfully disagree with the opinion by the majority that fails to perform the in-depth analysis necessary to set aside a valid contract, fails to address the declaratory judgment, and neglects to conduct de novo review of the summary judgment as it relates to the eleven-count counterclaim. I begin by noting that the record in this case is voluminous, consisting of four case files from the Superior Court, including a sixty-four-page memorandum in support of summary judgment, a forty-eight-page objection, and numerous exhibits in support of both the motion and objection. Additionally, the papers filed with this Court, although extensive, are incomplete, requiring resort to a confusing Superior Court record in order to accomplish de novo review, as we are bound to perform. Accordingly, I set forth my concerns.

The Declaratory Judgment
The first order of business in this case, in my opinion, is determining whether, in granting summary judgment on the declaratory judgment complaint, the Superior Court trial justice erred in declaring that "the release is valid and effective to resolve the claims by the Rafaelians against the Takians arising out of the ownership of the real estate and the operation of the business." The trial justice also declared that the release was valid and effective to bar most, but not all, of the counterclaims of the Rafaelians.[12] Of equal concern to me is the confusing and, I suggest, inconsistent treatment in the majority opinion respecting Randolph. See infra.
Relying upon this Court's holding in Guglielmi v. Rhode Island Hospital Trust Financial Corp., 573 A.2d 687, 689 (R.I. 1990), the majority upholds the finding of the trial justice that the release is valid on its face as to all counterclaim defendants. The validity of a release is dependent upon well-established factors: whether there was consideration for its execution, the business experience of the contracting party, and whether that party was represented by counsel. See id. I concur with the *53 majority's holding that these factors are present.[13] However, whether a valid release is enforceable, or may be set aside, is the seminal question in this case and is not, in my opinion, adequately or appropriately addressed by the majority. Vacating a summary judgment declaring that a contract is valid and enforceable because there are genuine issues of material fact outstanding is serious business  it can be accomplished only on strict and narrow grounds, and those grounds must be raised to the trial justice in the first instance.
My careful review of the record in this case reveals that defendants did not file an answer to plaintiff's complaint for declaratory and injunctive relief. Instead, they filed an eleven-count counterclaim, and a second amended counterclaim that is the operative pleading before us. The only count in the counterclaim relating to the release and indemnification agreement between the parties is count 4, entitled "Fraudulent Inducement to Enter Into Release [Against the] Takians and Randolph." That is the lone defense against enforceability of the release raised by defendants and the only issue passed upon by the trial justice respecting the release. The allegations in count 4 consist of the following:
"79. The actions of the Counterclaim defendants were such as to have fraudulently induced the Rafaelians to act in reliance thereon, materially change their position and enter into the Release.
"80. The Rafaelians are accordingly entitled to rescission and/or avoidance of the Release, crediting the Counterclaim defendants for all sums paid there under as a set-off to the damages incurred by the Rafaelians as described throughout this Counterclaim."
I pause to note that as to Randolph, the majority opinion upholds summary judgment on this count. The majority agrees, as do I, with the finding of the trial justice that defendants "have pointed to nothing in the memoranda or in argument before this Court in the way of specific representations or concealed facts by Randolph Takian upon which they conceivably relied upon to their detriment in settling their dispute with the Takians." The majority opinion declares that "defendants did not demonstrate that they reasonably relied, to their detriment, on representations made by Randolph." The opinion goes on to conclude that, save for the fact that Randolph "served as a conduit for most of the communication between his parents and defendants, defendants point to no specific representations made by Randolph that resulted in any injury to them." Having upheld the dismissal of count 4 as against Randolph, the majority opinion also appears to uphold the validity of the release as against Randolph. If this is so, then all counts in the counterclaim in which he is named, to the extent those counterclaims relate to Randolph, should be dismissed  a delicate surgery under the best of circumstances.[14]
*54 Turning to the Takians, the validity of the release is the central issue in this case. If the release is enforceable, then most of defendants' counterclaims against Charles and Marguerite Takian are barred. In vacating summary judgment respecting the validity of the release, the majority fails to conduct appropriate de novo review of this critical issue. The opinion does not focus its analysis on the only reason argued by defendants to justify setting aside the release  fraudulent inducement. Additionally, if Randolph did not make any representations upon which defendants relied to their detriment, what induced the Rafaelians to enter into the release? What material facts are in this record, which, if true, amount to fraudulent inducement by the Takians? Otherwise, under what grounds may the release be set aside?
This Court steadfastly has held that a valid contract may be deemed unenforceable, or set aside, under very limited circumstances. Because an executed release constitutes a contract between the parties, whether it is enforceable is governed by traditional and deeply-rooted contract principles. See Young v. Warwick Rollermagic Skating Center, Inc., 973 A.2d 553, 558 (R.I.2009). It is well-settled that "an executed release of a claim is valid absent an affirmative showing that the release was obtained by fraud, misrepresentation, an overreaching on the part of one of the parties, or a showing that a material mistake had occurred." Griffin v. Bendick, 463 A.2d 1340, 1345 (R.I.1983) (citing Boccarossa v. Watkins, 112 R.I. 551, 554-55, 313 A.2d 135, 136-37 (1973) (emphasis added)). This is so because settlements of controversies before they enter the court system serve a valuable function in our society. Id. "If releases were taken lightly and rescinded, the incentive to settle would dissipate and parties opting for such a course could never be secure from litigation." Id. We consistently adhere to these strict requirements for setting aside a valid release because such a rationale "represents both sound administrative policy and a pragmatic approach to civil-dispute resolution." Bonniecrest Development Co. v. Carroll 478 A.2d 555, 559 (R.I.1984). "Finality has its virtue." Griffin, 463 A.2d at 1345 (quoting Boccarossa, 112 R.I. at 558, 313 A.2d at 138). Thus, "only under limited specified conditions such as fraud, misrepresentation, or mutual mistake will a release, valid on its face, be set aside." Lapre v. Flanders, 465 A.2d 214, 217 (R.I. 1983).
Additionally, the rule that parol evidence may not be used to defeat a written contract applies equally to releases. "If parties have put their contract into writing, the written instrument is to be regarded as the only evidence of the contract as finally concluded: oral evidence of what was said or done during the negotiations will not be admitted either to contradict what is written or to supply terms with respect to which the writing is silent." LaBelle v. DiStefano, 85 R.I. 359, 364-65, 131 A.2d 814, 817 (1957) (quoting Myron v. Union Railroad Co., 19 R.I. 125, 125-26, 32 A. 165, 165 (1895)). "[A] party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." Manchester v. Pereira, 926 A.2d 1005, 1012 (R.I.2007) (quoting F.D. McKendall Lumber Co. v. Kalian, 425 A.2d 515, 518 (R.I.1981)). This Court always refuses "to read nonexistent terms or limitations into a contract." Papudesu v. Medical Malpractice Joint Underwriting Association of Rhode Island, 18 A.3d 495, 499 (R.I.2011) (quoting *55 Pearson v. Pearson, 11 A.3d 103, 109 (R.I. 2011)). When a contractual agreement, including a mutual release and indemnification contract, is plain and unambiguous, its meaning may not be determined by resort to parol evidence or extrinsic aids. See National Refrigeration, Inc. v. Standen Contracting Co., 942 A.2d 968, 972 (R.I.2008).
In light of these well-established principles and the complexity of this case, it is my belief that in vacating the decision of the trial justice declaring the release valid and binding, it is incumbent upon the Supreme Court, in de novo fashion, to set forth the genuine issues of material fact that relate to the claim of fraudulent inducement. Failing that, the Court should set forth what other grounds there are, if any, upon which the release may be vacated, and not leave the parties to wonder. Herein lie my concerns with the majority's opinion.
The only allegation the Rafaelians raised challenging the validity of the release is fraudulent inducement. The trial justice found that defendants "have pointed to no representations on the part of the Takians upon which they reasonably and justifiably [relied] in executing the release." The majority opinion affirms this finding as it relates to Randolph and vacates it with respect to the Takians. The majority opinion erroneously concludes that the trial justice upheld the release based on his "conclusion that defendants knew when they signed the document not only about plaintiffs' mismanagement and misappropriation, but also about the potential for more significant wrongdoing." According to the majority, the trial justice "relied primarily on defendants' memorandum to plaintiffs containing the threat to conduct a `full audit.'" This reasoning ignores the unequivocal finding by the trial justice that defendants failed to point to any fraudulent misrepresentations by the Takians that induced them into releasing the Takians from "any and all claims arising out of the ownership of the property and operation of the business." (Emphasis added.) This is, after all, a declaratory judgment action.
More importantly, the majority opinion goes on to hold that "[w]hether plaintiffs committed acts or omissions that would render the release voidable * * * requires the resolution of material facts that the parties genuinely, indeed vigorously, disputed." What material facts are relevant other than affirmative proof that the Rafaelians  as they allege  were fraudulently induced to enter into the release? If there are other factors that justify voiding the release  beyond fraudulent inducement, as alleged in the counterclaim  what are those circumstances? The opinion fails to identify them.
Of great concern to me, is the majority's reliance on the subjective belief of the Rafaelians at the time they entered into the release. According to the majority, "[t]he record clearly shows that defendants steadfastly and vigorously contended throughout the course of this litigation that their demand for a $100,000 payment from plaintiffs represented, in their minds, only their fair share of distributions based on what they believed had already been distributed to plaintiffs, plus additional losses attributable to plaintiffs' mismanagement, but not for any further wrongdoings." (Emphases added.) If this observation constitutes grounds for setting aside the release or cabining its reach, then this constitutes new law. The steadfastly and vigorously held belief of defendants that the release did not encompass as-yet-undiscovered wrongs amounts to nothing more than a unilateral mistake or an undisclosed subjective intent by a contracting party (that emerges for the *56 first time in the rearview mirror)  factors that are never enough to set aside a valid contract. Furthermore, in the absence of a finding of contract ambiguity, there is no authority to go beyond the plain and unambiguous language of the release in order to vary the terms of a written contract. Whether a contract is clear and unambiguous is a question of law. Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I.1996). If a party's steadfastly and vigorously held beliefs are enough to set aside a release, then this new doctrine should be accomplished with greater care and careful citation to authority.[15] The opinion fails to cite any law for this new frontier.
The trial justice explicitly found the following: "[A]s a matter of law, based on the materials that have been presented, I see no actionable fraud that would justify setting aside the release." (Emphases added.) The majority opinion ignores this finding and fails to indicate under what circumstances a party's subjective belief can serve to set aside a valid release. If the release is subject to rescission at a trial on the merits, then the majority opinion should set forth explicitly what needs to be proven and by whom. These considerations are important factors to aid the parties, their attorneys, and the stalwart trial justice who must make sense of this case on remand.

The Counterclaims
In addition to granting summary judgment on the enforceability of the release and finding that the release barred most of the counterclaims, the trial justice also granted summary judgment as a matter of law on other counts in the counterclaim. I respectfully suggest that the majority opinion, which simply vacates the judgment as to the "direct claims" against Marguerite and Charles Takian, fails to conduct appropriate de novo review of these findings. Accordingly, because several counts in the counterclaim ultimately may be presented to a jury, I deem it necessary to note my concerns.
In reviewing the grant of summary judgment by a justice of the Superior Court, this Court conducts de novo review. Hill v. National Grid, 11 A.3d 110, 112 (R.I.2011). In so doing, we abide by the same standards and benchmarks as applied by the trial justice. Id. Summary *57 judgment is appropriate when no genuine issue of material fact is evident from the record before the trial justice and he or she finds that the moving party is entitled to prevail as a matter of law. Beacon Mutual Insurance Co. v. Spino Brothers, Inc., 11 A.3d 645, 648 (R.I.2011).
I note at the outset that in addition to the counts against Randolph that are discussed by the majority, Randolph is named as a party-defendant in other counts in the counterclaim, which the majority opinion fails to address  a situation that I find confusing and will, I suggest, result in chaos on remand. For instance, count 5, entitled "Breach of Fiduciary Duty [Against] the Takians and Randolph," specifically names Randolph as a defendant, claiming damages based on breach of fiduciary duty. Because the trial justice found, as a matter of law, that Randolph owed no duty to defendants, summary judgment on this count in the counterclaim as to Randolph should be affirmed. Furthermore, count 5 also seeks to impose liability on the Takians for breach of fiduciary duty to Lumar. Like count 1, this is a shareholder derivative claim and should be dismissed.
With respect to count 9, which alleges abuse of process against both the Takians and Randolph for filing a miscellaneous petition in Superior Court seeking the Rafaelians' financial records, as well as this declaratory judgment action, the majority opinion fails to address this count as it relates to Randolph. Clearly, the release does not relate to any conduct occurring after the sale of the property. The majority opinion overlooks this count and provides no guidance to the parties or the trial court on remand.
Finally, I find the RICO counts particularly troubling. The trial justice, based on his conclusion that the release was valid, granted summary judgment on count 10, entitled "Violation of Rhode Island Racketeer Influenced and Corrupt Organizations Act." The majority opinion reinstates that claim, but fails to address the fact that the allegations in this count rely on the moribund Lumar, as the "enterprise"  a crucial element in any RICO action. Furthermore, the racketeering activity alleged to have occurred rests, in part, on the allegations set forth in count 1, the derivative claim. Whether a RICO action can survive when the enterprise is a defunct corporation is a question that is left unanswered by the majority. What is the organized enterprise in this case? Moreover, whether count 11, "Conspiracy to Violate RICO" survives summary judgment is an open question. This counterclaim alleges that the Takians and Randolph "have combined, conspired and confederated to conceal and further their larceny and further the goals of the enterprise[, the defunct Lumar] * * *." I would affirm the grant of summary judgment on counts 10 and 11, but on grounds other than those relied upon by the trial justice.

Conclusion
For the reasons set forth in this opinion, I respectfully concur in part and dissent in part. I concur in the decision of the majority declaring the release to be valid on its face. I also concur with that portion of the opinion that affirms the grant of summary judgment on count 1, the shareholder derivative claim. I concur in that portion of the majority opinion that affirms summary judgment as to Randolph on counts 3, 4, 6, 7 and 8.
I dissent from that part of the decision that remands the case to the Superior Court to determine whether the release should be set aside. And I dissent from that portion of the majority decision that *58 fails adequately to address the manner in which the release may be set aside and the grounds for doing so.
I dissent from that portion of the majority decision that vacates summary judgment on count 5, breach of fiduciary duty, as it relates to Randolph, and that portion of count 5 that seeks to impose liability on the Takians for breach of fiduciary duty to Lumar.
I dissent from that portion of the majority opinion that vacates summary judgment on counts 10 and 11, regarding RICO and conspiracy to commit racketeering.
NOTES
[1] Warren Buffet.
[2] The plaintiff Randolph Takian was not involved in the original purchase of the property or the creation of the corporation.
[3] The balance was paid for with loans from defendants' children, who held a promissory note and mortgage on the property. In addition, defendants maintain they periodically loaned Lumar additional money.
[4] To enhance the clarity of our analysis, we summarize defendants' counterclaims as follows: (1) derivative action by Rafaelians as shareholders of Lumar against Charles and Marguerite Takian; (2) intentional fraud against Charles and Marguerite Takian; (3) negligent misrepresentation against Randolph Takian; (4) fraudulent inducement against Charles, Marguerite, and Randolph Takian; (5) breach of fiduciary duty against Charles and Marguerite Takian; (6) breach of implied covenant of good faith and fair dealing against Charles, Marguerite, and Randolph Takian; (7) loss of business opportunity against Charles, Marguerite, and Randolph Takian; (8) fraudulent inducement to sell interest in real estate against Charles, Marguerite, and Randolph Takian; (9) abuse of process against Charles, Marguerite, and Randolph Takian; (10) violation of the Rhode Island R.I.C.O. Act against Charles, Marguerite, and Randolph Takian; (11) conspiracy to violate the R.I.C.O. Act against Charles, Marguerite, and Randolph Takian.
[5] Final judgment was entered for plaintiffs on August 30, 2010. The defendants did not file their notice of appeal until October 6, 2010, after the window for filing the notice had closed. Nonetheless, as is reflected in an order dated December 9, 2010, the Court decided to treat defendants' notice of appeal as a petition for common-law certiorari and granted the petition.
[6] As at least one scholar notes, the basis for the rule is not entirely sound because "non-contemporaneous shareholders can enjoy the benefits of corporate recovery if any shareholder who owned stock at the time of the wrongdoing brings a derivative suit." Franklin A. Gevurtz, Corporation Law § 4.3.2 at 420 (2d ed.2010).
[7] There is a split of authority in the federal courts about what constitutes a single "transaction" for the purposes of the contemporaneous-shareholder rule, which has caused some courts to consider the so-called "continuing-wrong" doctrine. See, e.g., Bateson v. Magna Oil Corp., 414 F.2d 128 (5th Cir.1969); Hoover v. Allen, 180 F.Supp. 263 (S.D.N.Y.1960). The facts of this case, however, do not involve such wrongs; hence we need not, and do not, express an opinion with respect to that rule.
[8] Counts 10 and 11 of the complaint also alleged RICO violations against Randolph Takian, along with his parents. However, because our holding on those counts is predicated upon our holding with respect to the validity of the release, infra at section 2, we shall address counts 10 and 11 below.
[9] The motion justice noted that it "could be clearer" that defendants were referring to this other illegal conduct in their memorandum, but nonetheless he resolved the issue against defendants.
[10] Both defendants testified in their respective depositions that they did not suspect the kind of embezzlement and diversion of proceeds they allege that they uncovered until after the sale.
[11] The dissent suggests that we take it upon ourselves to dispose of these claims on other grounds. We respectfully decline to do so. In our opinion, the record already is tangled enough, and in our opinion, the more prudent course of action is to allow the Superior Court to consider these claims on remand.
[12] Summary judgment was granted on some of the counterclaims pursuant to Rule 56 of the Superior Court Rules of Civil Procedure, based on the traditional finding of lack of evidence in the pleadings, interrogatories, depositions and affidavits submitted in opposition. The majority opinion ignores this portion of the trial justice's decision. See infra.
[13] Inexplicably, however, the majority opinion also goes on to fault the trial justice for concluding that defendants satisfied the "business experience" element necessary to find a valid release and seems to imply that this was a finding by the trial justice that resolved a genuine issue of material fact that must be reserved for the fact-finder. This portion of the majority opinion is in stark conflict with its holding that the release is valid in the first instance: "We agree with the motion justice's finding that the parties did not seriously dispute whether the release was proper on its face." Thus, whether the trial justice concurred that defendants were sophisticated business persons does not present a question of material fact, especially since no one disputed the "fact" that Ralph Rafaelian was an experienced businessman.
[14] Count 9, the claim for abuse of process, may survive this excision because it alleges conduct occurring after the contract of release, to wit, the filing of this very lawsuit. See infra.
[15] The reference in the majority opinion to Hendrick v. Hendrick, 755 A.2d 784 (R.I. 2000), equally is baffling. The dispute in Hendrick concerned a claim of oppression against a minority shareholder (the widow of one of the brothers in a closely held, family owned, golf course), as well as a shareholder derivative action with respect to a corporation in good standing. This Court vacated summary judgment on the widow's claim of oppression by the majority shareholders on the ground that genuine issues of material fact existed as to whether she was entitled to dissolution of the corporation in accordance with G.L.1956 § 7-1.1-90. Hendrick, 755 A.2d at 791-93. I fail to glean the relevance of Hendrick to the validity of the release in the case at bar.

However, I endorse the careful and detailed mandate issued by the Court in Hendrick, aimed at "severing the tangled Gordian knot that has been strangling the litigants in this case for more than five years * * *." Id. at 794. The Court in Hendrick issued what it deemed to be "a fair, yet appropriately sharp-edged remedy to cut through this protracted family feud and thus achieve a final and fair conclusion to this litigation." Id.
In the case on appeal, the property was purchased over twenty-five years ago, and this protracted fight among former friends is approaching its tenth anniversary; there was a buyout of one side by the other, a payment of $100,000 was made in lieu of a full audit, and a document entitled "joint and mutual release and indemnity agreement" was executed. The fact that the majority opinion fails to address under what circumstances the release may be set aside when the case lands back in the Superior Court, tangles the knot and kinks the line.